**[This opinion has been published in *Ohio Official Reports* at 75 Ohio St.3d 344.]**

THE STATE OF OHIO, APPELLEE, *v.* WOGENSTAHL, APPELLANT.

**[Cite as *State v. Wogenstahl*, 1996-Ohio-219.]**

*Criminal law—Aggravated murder—Death penalty upheld, when—Penalties and sentencing—"Aggravating circumstances" against which mitigating evidence is to be weighed are limited to specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) alleged in indictment and proved beyond a reasonable doubt—Improper comment by prosecutor in penalty phase of capital trial—Death sentence vacated on appeal and cause remanded for resentencing, when.*

1. In the penalty phase of a capital trial, the "aggravating circumstances" against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt.

2. It is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are "aggravating circumstances."

(No. 95-42—Submitted November 15, 1995—Decided March 6, 1996.)

APPEAL from the Court of Appeals for Hamilton County, No. C-930222.

————————————

{¶ 1} Peggy Garrett was first introduced to Jeffrey A. Wogenstahl, appellant, in October 1991. During October and November 1991, appellant and Peggy became casual acquaintances. At the time, Peggy resided in a two bedroom apartment at 301 Harrison Avenue, Harrison, Ohio, with her five children: Eric Horn, age sixteen, Justin Horn, age fifteen, Amber Garrett, age ten, Matthew Garrett, age eight, and Shayna Perkins, age four. During October and November

1991, appellant visited the apartment on several occasions and came to know Peggy's family.

{¶ 2} Appellant went to Peggy's apartment on Saturday afternoon, November 23, 1991. He asked Peggy if she had any plans for the evening. Peggy told appellant that she had no plans, and appellant left following a brief conversation. That night, Peggy put her three youngest children (Amber, Matthew and Shayna) to bed for the evening. At approximately 10:30 p.m., she decided to meet a friend, Lynn Williams, at a local bar. Justin was spending the weekend at a friend's house. Peggy left sixteen-year-old Eric in charge of the other children.

{¶ 3} Peggy met Lynn Williams at the "Escape" bar sometime between 11:00 p.m. and midnight. From there, the women drove Lynn's car to the Miamitown Lounge which was also known as "Hornsby's." At Hornsby's, Peggy and Lynn saw appellant at the bar. He was wearing a brown leather jacket and jeans. Appellant joined the women for drinks and conversation. Appellant asked Peggy where Justin was and what Eric and the other children were doing. Peggy told appellant that Justin was away for the weekend, and that Eric was home baby-sitting the children. At some point, the trio went outside to appellant's car to smoke marijuana.

{¶ 4} On Sunday morning, at approximately 2:15 a.m., appellant, Peggy and Lynn drove Lynn's car to the Flicker Inn. Later, the women drove appellant back to Hornsby's, where appellant's car was parked. Appellant invited the women to his apartment to smoke marijuana, but Peggy and Lynn told appellant that they were going to the Waffle House restaurant. Peggy and Lynn then separated from appellant and drove directly to the Waffle House. After the women had arrived at the restaurant, a witness saw a car resembling appellant's dark-brown four-door 1978 Oldsmobile Omega pull into and then out of the restaurant parking lot.

{¶ 5} At approximately 3:00 a.m., while the women were at the Waffle House, appellant drove to Peggy's apartment and spoke with Eric. According to

Eric, appellant claimed that Peggy needed to see him (Eric) at Troy Beard's house. Beard was Peggy's friend who lived approximately three blocks from the apartment. Eric locked the door to the apartment, leaving the children unattended, and drove with appellant to the vicinity of Beard's residence. Appellant dropped Eric off approximately one block from Beard's apartment. According to Eric, appellant said that he would drive around the block and then pick Eric up to drive him home. When Eric arrived at the residence, Beard told Eric that he (Beard) had not seen Peggy at all that evening. Eric left Beard's apartment and waited for appellant to drive him home. Appellant did not return. Eventually, Eric walked home and found that the door to the apartment was unlocked. He checked on the children and noticed that ten-year-old Amber was missing. However, Eric mistakenly assumed that Amber might have been spending the night at a friend's house. Thus, he mentioned nothing to Peggy when she returned home later that morning.

{¶ 6} On the morning of November 24, 1991, Vickie Mozena was working at a United Dairy Farmers store in Harrison, Ohio, near the Ohio-Indiana border. At approximately 3:15 a.m., Mozena saw a car resembling appellant's Oldsmobile drive past the store in the direction of Bright, Indiana. Mozena observed the silhouette of a man driving the vehicle, and what appeared to be a young girl next to him in the passenger's seat. Between 3:45 and 4:00 a.m., Mozena saw the same vehicle parked at a car wash across the street from the United Dairy Farmers store. The vehicle pulled out of the car wash and into the farthest corner of the United Dairy Farmers parking lot. The driver did not exit the vehicle for several minutes, and Mozena thought that she was about to be robbed. However, appellant exited the vehicle, came into the store, and purchased a pack of cigarettes. At that time, Mozena noticed what appeared to be dirt or blood under appellant's fingernails. Later that morning, Mozena once again saw appellant's car parked across the street

at the car wash. According to Mozena, there was a man inside the car, presumably cleaning the interior.

{¶ 7} Harold Borgman lived on Jamison Road between Harrison, Ohio, and Bright, Indiana. Borgman's home was located in a rural area of West Harrison, Indiana, approximately four miles from Harrison. At 3:13 a.m. on the morning of November 24, 1991, Borgman got out of bed to use the bathroom. Sometime later, he looked out the window and saw a car driving very slowly on Jamison Road toward the direction of Harrison. The driver pulled off to the side of Jamison Road, stopped, and turned off the headlights. Borgman continued to watch for several minutes, and observed two or three vehicles pass the parked car on Jamison Road.

{¶ 8} On November 24, at approximately 3:40 a.m., Brian Noel was driving on Jamison Road toward Bright, Indiana. While driving near the location of Borgman's residence, Noel saw a late 1970's model, dark-colored four-door vehicle parked off to the side of Jamison Road, the vehicle facing the opposite direction. Noel came to a rolling stop alongside the vehicle and observed a man apparently retrieving something from the trunk of the automobile. The man was wearing a dark jacket and bluejeans. Noel later identified appellant as the man he had seen on Jamison Road in the early morning hours of November 24. He also identified appellant's 1978 Oldsmobile as the car that had been pulled off to the side of Jamison Road.

{¶ 9} On November 24, at approximately 3:40 a.m., Kathy Roth was driving on Jamison Road toward Bright, Indiana. While driving near the location of Borgman's residence, Roth saw a man wearing a brown leather jacket and bluejeans standing near a parked car off to the side of Jamison Road. As Roth drove past the vehicle, the man turned to face her, dropped his head, and then turned around to face the woods. Roth later identified appellant as the man she had seen on Jamison Road.

{¶ 10} Frederick G. Harms was driving on Jamison Road on November 24, at approximately 3:40 a.m. Harms also saw the vehicle parked off to the side of Jamison Road. According to Harms, the vehicle resembled appellant's 1978 Oldsmobile Omega.

{¶ 11} On Sunday afternoon, November 24, Peggy Garrett finally realized that Amber was missing. At that time, Eric told Peggy about appellant's 3:00 a.m. visit to the apartment. Peggy and others went to appellant's residence and knocked on the door for over an hour. When appellant finally answered, Peggy asked him why he had taken Eric to Troy Beard's apartment earlier that morning. Appellant stated that he had been "messing with Eric's head," and claimed to have no knowledge of Amber's whereabouts. On the evening of November 24, 1991, appellant gave a similar statement to Officer Charles Lindsey of the Harrison Police Department.

{¶ 12} On Monday, November 25, 1991, police executed a search warrant at appellant's residence. During the search, appellant was questioned concerning his movements on the morning of November 24. Appellant admitted to having visited the Harrison Avenue apartment on November 24 at approximately 3:00 a.m. Appellant told police that he had duped Eric out of the Harrison Avenue apartment as a practical joke. However, appellant stated that he went directly home to bed after having taken Eric to the vicinity of Troy Beard's apartment. Police then requested that appellant accompany them to the Harrison Police Department. Appellant agreed to go to the police station and asked for his leather jacket. Officer Lindsey retrieved the jacket from the bedroom closet. Lindsey noticed that the jacket was soaking wet and that the lining was discolored. According to police, appellant explained that his cat had urinated on the jacket on *Friday* evening, November 22, 1991. Appellant further explained that he had washed the jacket on Friday night. Police were suspicious since appellant had worn the jacket on Saturday night, November 23, 1991.

{¶ 13} Police found several bloodstains in appellant's bathroom. However, it could not be determined whether the blood was human blood. The items seized from appellant's residence included drugs and drug paraphernalia. Police contacted appellant's parole officer, and a parole holder was placed against appellant. On November 25, 1991, police also attempted to search a dumpster near appellant's apartment. However, the dumpster had been emptied earlier that morning. Two witnesses had seen appellant near the dumpster on November 24, at approximately 5:15 a.m.

{¶ 14} On the morning of November 27, 1991, appellant made another statement to law enforcement authorities. This time, appellant claimed that he had driven Eric to the vicinity of Troy Beard's apartment on November 24 because Eric had wanted to deliver marijuana to Peggy. Appellant once again asserted that he had proceeded directly home to sleep after dropping Eric off in the vicinity of Beard's residence.

{¶ 15} Meanwhile, the search for Amber Garrett continued. On November 27, 1991, Harold Borgman reported to police that he had seen a suspicious vehicle on Jamison Road in the early morning hours of November 24. Borgman led police to the location near his house where he had seen the suspicious vehicle. Sergeant Kenneth J. Greves of the Indiana State Police searched the area and discovered Amber's partially frozen body down a steep embankment off to the side of Jamison Road.

{¶ 16} The location where Amber's body was discovered was heavily wooded and overgrown with thorny bushes and vegetation. Amber was wearing a dress and a pair of panties. Her dress had been rolled up from behind and pulled down over her arms. She had been stabbed approximately eleven times, mostly in the chest and neck. Additionally, she had been repeatedly struck in the head with a blunt instrument. The blunt force injuries were consistent with having been caused by an automobile jack handle or some other blunt stick or rod. Superficial

wounds on the body indicated that a knife had been held to the base of Amber's neck. The body was covered with postmortem scratches that had apparently been caused by the vegetation in the area. The evidence at the scene indicated that the murder had occurred at a different location and that the killer had carried Amber's body through the dense vegetation.

{¶ 17} William L. Dean, a criminalist in the Trace Evidence Section of the Hamilton County Coroner's Laboratory, examined the leather jacket that appellant had been wearing on the morning of Amber's abduction. Thorn tips or "prickles" were removed from small triangular tears in the jacket. Dean also examined a pair of appellant's shoes that were found to contain prickles and other plant material.

{¶ 18} Douglas W. Deedrick, a special agent with the Federal Bureau of Investigation, compared the plant material recovered from appellant's jacket and shoes with known samples of vegetation collected from the area where the body was discovered. Deedrick found that the plant material from appellant's clothing was similar to the vegetation collected from the crime scene. Additionally, Dr. Robert D. Webster, a research botanist, concluded that there were no differences between the vegetation recovered from appellant's clothing and the type of vegetation in the area where the body was discovered.

{¶ 19} Police found two car jacks in the trunk of appellant's Oldsmobile, a ratchet jack and a screw or "scissors" jack. The metal handle for the screw jack was missing. There were no identifiable fingerprints anywhere in the vehicle. The car was exceptionally clean, as if it had been thoroughly washed. However, criminalists in the Trace Evidence Section of the Hamilton County Coroner's Laboratory found a very small bloodstain in appellant's Oldsmobile. The specimen was sent to the Serological Research Institute in California for testing. DNA was extracted from the bloodstain and was tested using the HLA DQ (Haldo) Alpha genetic marker system. The HLA DQ Alpha classification of the blood removed from appellant's vehicle was consistent with the HLA DQ Alpha classification of

a known sample of Amber's blood. According to Brian Wraxall, a forensic serologist, Amber's HLA DQ Alpha classification occurs in approximately 5.3 percent of the Caucasian population. The blood recovered from appellant's vehicle was not consistent with appellant's blood or blood samples taken from Eric and Justin Horn.

{¶ 20} Special Agent Deedrick of the Federal Bureau of Investigation found a single pubic hair inside the crotch area of Amber's panties. Deedrick compared the pubic hair to known samples of pubic hair that had been combed and plucked from appellant's pubic region. According to Deedrick, appellant's pubic hairs exhibited the same microscopic characteristics as the pubic hair recovered from the victim's panties. Deedrick testified to a reasonable degree of scientific certainty that the pubic hair recovered from the victim's underpants had come from appellant. Amber was prepubescent and, thus, the hair could not have come from her. Pubic hair samples taken from Peggy Garrett, Eric Horn and Justin Horn did not match the pubic hair recovered from Amber's panties.

{¶ 21} Appellant was indicted by the Hamilton County Grand Jury for the aggravated murder of Amber. Count One of the indictment charged appellant for the purposeful killing of Amber during the commission of an aggravated burglary and/or kidnapping. This count of the indictment carried three death penalty specifications.[1] Appellant was also indicted, in Counts Two and Three, for kidnapping and aggravated burglary, respectively, with a specification alleging that appellant had a prior (1985) aggravated felony conviction.

{¶ 22} Appellant was tried before a jury. Bruce Wheeler was the prosecution's final witness in the guilt/innocence phase of the trial. Wheeler and

---

1. The first death specification alleged that appellant had purposefully killed Amber during the course of a kidnapping (R.C. 2929.04[A][7]), the second alleged that the killing occurred during the course of an aggravated burglary (R.C. 2929.04[A][7]), and the third alleged that appellant had killed Amber for the purpose of escaping detection, apprehension, trial, or punishment for having committed the aggravated burglary and/or kidnapping (R.C. 2929.04[A][3]).

appellant had been fellow inmates in the same "pod" at the Hamilton County Justice Center. At trial, Wheeler testified that he had spoken with appellant on several occasions concerning appellant's involvement in the killing. According to Wheeler, appellant had said that there was very little evidence against him because he had been "too slick" and had "covered up" the evidence. Further, appellant allegedly admitted to Wheeler that he (appellant) had entered the Garrett apartment with a stolen key and had kidnapped Amber to have sex with her. Wheeler testified that appellant "said he stuck it in her but * * * [did not] ejaculate * * * so there would not be any evidence." Additionally, appellant told Wheeler that he had wanted to return Amber to the apartment because he thought he could get away with having removed her from the residence. However, someone was at the Garrett residence when appellant attempted to return Amber to her home. Thus, according to Wheeler, appellant said that he decided to have "sex" with Amber once again. Wheeler testified that appellant admitted stabbing Amber in the chest when she refused his further sexual advances. According to Wheeler, appellant admitted killing Amber, dumping the body, cleaning the car, and disposing of the evidence. Appellant also told Wheeler that police had planted Amber's blood in his (appellant's) car because appellant had "cleaned his car too well."

{¶ 23} The defense presented several witnesses in the guilt phase of appellant's trial. Appellant testified on his own behalf and, among other things, denied the charges against him.

{¶ 24} The jury found appellant guilty of all charges and specifications alleged in the indictment. Following a mitigation hearing, the jury recommended that appellant be sentenced to death for the aggravated murder of Amber Garrett. The trial court accepted the jury's recommendation and imposed the sentence of death. The trial court also sentenced appellant for the kidnapping and aggravated burglary convictions. On appeal, the court of appeals affirmed the judgment of the trial court and upheld appellant's death sentence.

**{¶ 25}** The cause is now before this court upon an appeal as of right.

_____

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *William E. Breyer*, Assistant Prosecuting Attorney, for appellee.

*H. Fred Hoefle* and *Herbert E. Freeman*, for appellant.

_____

DOUGLAS, J.

**{¶ 26}** Appellant advances thirty-three propositions of law for our consideration. (See Appendix, *infra*.) We have carefully considered each of appellant's propositions of law and have reviewed the death sentence for appropriateness and proportionality. Upon review, and for the reasons that follow, we affirm the judgment of the court of appeals and uphold the sentence of death.

I

**{¶ 27}** We have repeatedly held that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. See, *e.g.*, *State v. Scudder* (1994), 71 Ohio St.3d 263, 267, 643 N.E.2d 524, 528. We adhere to that position today. Several issues raised by this appellant have been addressed and rejected under similar circumstances in a number of our prior cases. Moreover, a number of appellant's arguments have been waived. Upon a careful review of the record and the governing law, we fail to detect any errors that would undermine our confidence in the outcome of appellant's trial. We are convinced that appellant received a fair trial, a fair and reliable sentencing determination, and competent representation both at trial and on appeal. We address, in opinion form, only those matters that merit some discussion.

II

**{¶ 28}** In his thirteenth proposition of law, appellant contends that the state engaged in "egregious misconduct" during closing arguments in the penalty phase. Specifically, appellant contends, among other things, that the prosecutors had

argued to the jury that the nature and circumstances of the offense appellant was found guilty of committing were "aggravating circumstances" the jury was required to consider in recommending the sentence to be imposed for appellant's aggravated murder conviction. Therefore, appellant suggests that the state improperly injected "nonstatutory aggravating circumstances" into the sentencing determination. Similarly, in his sixth proposition of law, appellant contends that the trial court, in its sentencing opinion, considered the nature and circumstances of the offense as "nonstatutory aggravating circumstances." Before addressing the specific arguments raised in these propositions of law, it is important to recognize the distinctions between two very different concepts embodied in Ohio's death penalty statutes, *i.e.*, "aggravating circumstances" and "nature and circumstances of the offense."

### A

*Aggravating Circumstances v. Nature and Circumstances*

{¶ 29} Contentions similar to those raised by appellant (that the nature and circumstances of the offense were converted into "nonstatutory aggravating circumstances") arise in nearly every capital case we review. Recently, in *State v. Gumm* (1995), 73 Ohio St.3d 413, 416-423, 653 N.E.2d 253, 259-264, we attempted to clarify the law in this area. However, appellant suggests that *Gumm* misapplied the law and/or that further clarification is required. Thus, we once again review the interplay among R.C. 2929.03(D)(1) and (2) and 2929.04(B) to clarify that it is completely improper for prosecutors in the penalty phase of a capital murder trial to make any comment before a jury that the nature and circumstances of the offense are "aggravating circumstances."

{¶ 30} In Ohio, imposition of the death penalty for aggravated murder is precluded unless one or more of the *statutory* aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) are specified in the indictment and proved beyond a reasonable doubt. See R.C. 2929.04(A). As we explained in *Gumm*,

*supra*, 73 Ohio St.3d at 417, 653 N.E.2d at 260, "[i]n Ohio, a capital defendant is tried and sentenced in a two-stage process. During the first phase (commonly referred to as the 'guilt phase') the state must prove the defendant guilty beyond a reasonable doubt of the crime of aggravated murder, and must also prove the defendant guilty of at least one statutorily defined 'aggravating circumstance' as set forth in R.C. 2929.04(A)(1) through (8). At the point in time at which the factfinder (either a jury or three-judge panel) finds the defendant guilty of both aggravated murder and an R.C. 2929.04(A) specification, the defendant has become 'death-eligible,' and a second phase of the proceedings (the 'mitigation' or 'penalty' or 'sentencing' or 'selection' phase) begins. R.C. 2929.03(C)(2) and (D)(1)."

{¶ 31} R.C. 2929.03(D)(1) provides that in making a determination whether a death sentence should be imposed, "[t]he court, and the trial jury if the offender was tried by a jury, *shall consider * * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing* or to any factors in mitigation of the imposition of the sentence of death, *shall hear testimony and other evidence that is relevant to the nature and circumstances of the aggravating circumstances the offender was found guilty of committing*, the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code, and any other factors in mitigation of the imposition of the sentence of death, and shall hear the statement, if any, of the offender, *and the arguments, if any, of counsel for the defense and prosecution, that are relevant to the penalty that should be imposed on the offender*." (Emphasis added.)

{¶ 32} Thus, R.C. 2929.03(D)(1) mandates that in a capital jury trial, the court and the jury "shall consider" any evidence that is relevant to the "aggravating circumstances" the defendant was found guilty of committing. The "aggravating circumstances" referred to in R.C. 2929.03(D)(1) are the statutory aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8). Further, R.C.

2929.03(D)(1) requires that the trial court and jury "hear" testimony and other evidence that is relevant to the *nature and circumstances of the aggravating circumstances the offender was found guilty of committing*. Again, the "aggravating circumstances" referred to in the statute are the R.C. 2929.04(A)(1) through (8) death-eligible aggravating circumstances that were required to have been specified in the indictment. R.C. 2929.03(D)(1) also permits the factfinder to hear the arguments of counsel that are relevant to the penalty that should be imposed on the defendant.

{¶ 33} R.C. 2929.03(D)(2) provides, in part:

"Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section [pre-sentence investigation and mental examination reports], *the trial jury, if the offender was tried by a jury, shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend to the court that the sentence of death be imposed on the offender.*" (Emphasis added.)

{¶ 34} In *Gumm*, *supra*, 73 Ohio St.3d at 419, 653 N.E.2d at 261, we reviewed the requirements of R.C. 2929.03(D)(1) and (2) and concluded that "[t]hese statutes thus expressly require the jury to 'consider' both relevant trial evidence as well as 'other' evidence relevant to the aggravating circumstances the offender was found guilty of committing. Because findings of guilt are only made as to the specifications contained in the indictment, *it is clear that the reference in these provisions to 'aggravating circumstances the offender was found guilty of committing' means the R.C. 2929.04(A) specifications set forth in the indictment and at issue in each case*. The jury is thus required to 'consider' 'other evidence'

relevant to those specifications, including evidence relevant to the nature and circumstances of those specifications." (Emphasis added.) In *Gumm, supra*, syllabus, we held that:

"Subject to applicable Rules of Evidence, and pursuant to R.C. 2929.03(D)(1) and (2), counsel for the state at the penalty stage of a capital trial may introduce and comment upon (1) any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, (2) any other testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified in the indictment of which the defendant was found guilty, (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant, (4) the presentence investigation report, where one is requested by the defendant, and (5) the mental examination report, where one is requested by the defendant. Further, counsel for the state may comment upon the defendant's unsworn statement, if any. (R.C. 2929.03[D], construed; *State v. DePew* [1988], 38 Ohio St.3d 275, 528 N.E.2d 542, affirmed and followed.)"

{¶ 35} R.C. 2929.04(B) provides that when one or more of the R.C. 2929.04(A)(1) through (8) specifications of aggravating circumstances contained in the indictment are proved beyond a reasonable doubt, "the court, trial jury, or panel of three judges shall consider*, and weigh against the aggravating circumstances* proved beyond a reasonable doubt, *the nature and circumstances of the offense*, the history, character, and background of the offender, and [all of the factors listed in R.C. 2929.04(B)(1) through (7)]." Therefore, R.C. 2929.04(B) clearly mandates that the nature and circumstances of the offense may only be "weighed" against the R.C. 2929.04(A) specifications of aggravating circumstances the defendant was found guilty of committing. We have recognized this concept in a number of our prior cases.

14

**{¶ 36}** For example, in *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, we recognized that for purposes of determining whether a capital defendant should be sentenced to death, the nature and circumstances of the offense are *not* to be weighed against the R.C. 2929.04(A) specifications of aggravating circumstances but, rather, are to be reviewed for any possible mitigating value. Specifically, in addressing an argument that the trial court in *Steffen* improperly considered the nature and circumstances of the offense, we stated that:

"R.C. 2929.04(B) provides that the court, in determining whether death is an appropriate penalty, 'shall consider, *and weigh against the aggravating circumstances* proved beyond a reasonable doubt, *the nature and circumstances of the offense * * *.*' * * * Thus, the court is required to review this factor. However, appellant appears to contend that the trial court's remarks on this subject reveal that it viewed the nature and circumstances of the offense herein as aggravating *rather than mitigating as required by R.C. 2929.04(B).* We do not agree. The statute merely requires that the court consider this factor *in determining the mitigating factors to be weighed against the proven aggravating circumstances*. Obviously, the nature and circumstances of certain offenses will be such that no mitigating feature can be extracted. By its statement on the gruesome and vicious nature of the murder, the trial court herein was merely justifying its conclusion that no mitigating factors can be gleaned from the nature and circumstances of this particular offense. We find nothing improper in the trial court's remarks." (Emphasis added in part and deleted in part.) *Steffen*, *supra*, 31 Ohio St.3d at 116-117, 31 OBR at 278, 509 N.E.2d at 390.

**{¶ 37}** Similarly, in *State v. Stumpf* (1987), 32 Ohio St.3d 95, 99, 512 N.E.2d 598, 604, we stated that "R.C. 2929.04(B) requires the jury, trial court, or three-judge panel to 'consider, *and weigh against the aggravating circumstances* proved beyond a reasonable doubt, *the nature and circumstances of the offense* *

* *.' * * * In a particular case, the nature and circumstances of the offense may have a mitigating impact, or they may not. * * * Either way, they must be considered." (Emphasis added in part and deleted in part.) See, also, *State v. Davis* (1988), 38 Ohio St.3d 361, 367-373, 528 N.E.2d 925, 931-936.

{¶ 38} Obviously, it is perfectly acceptable for the prosecution at the penalty phase of a capital murder trial to argue that the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that the defendant was found guilty of committing outweigh the evidence in mitigation of the death sentence. Further, it is perfectly acceptable for the state to present arguments concerning the nature and circumstances of the offense. However, in light of the foregoing discussion, it is wholly *improper* for the state to argue or suggest that the nature and circumstances of the offense are "aggravating circumstances." Any such comment or suggestion is improper for at least two reasons. First, Ohio's death penalty scheme clearly provides that the "aggravating circumstances" against which the mitigating evidence is to be weighed are limited to the death-eligible statutory aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8). Second, R.C. 2929.04(B) specifically provides that the court, trial jury, or three-judge panel "*shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense * * *.*" (Emphasis added.) Thus, in the penalty phase of a capital murder trial, any use of the term "aggravating circumstances" must be confined to the statutory aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8). Recognizing this, in *Gumm, supra*, 73 Ohio St.3d at 422, 653 N.E.2d at 263, we issued a strong admonition that courts and prosecutors should refrain from referring to the nature and circumstances of the offense as "aggravating circumstances."

{¶ 39} At oral argument, appellant criticized our decision in *Gumm,* suggesting that *Gumm* somehow renders Ohio's entire death penalty scheme unconstitutional. We disagree. However, upon a careful review of *Gumm*, we find

certain errors in the body of that decision that seemingly cut across the grain of Ohio's death penalty scheme. In *Gumm*, *supra*, 73 Ohio St.3d at 420-421, 653 N.E.2d at 262, we stated that:

"We believe that a large part of the confusion which has developed in this area is semantical in nature in that the term 'aggravating circumstances' has been imprecisely employed to refer not only to the eight enumerated specifications of aggravating circumstances of R.C. 2929.04(A), but also to any evidentiary factors which tend to increase the likelihood that a death sentence will be imposed. *The nature and circumstances of a crime may be 'aggravating' in the sense that they are relevant and tend to reinforce the conclusion that a death sentence should be imposed.* This does not mean that the facts surrounding a crime can be set forth in the indictment as a specified statutory aggravating circumstance, nor may they be deemed an 'aggravating circumstance' in terms of determining death-eligibility. *State v. Johnson* (1986), 24 Ohio St.3d 87, 24 OBR 282, 494 N.E.2d 1061. *Thus, the fact that a particular murder was, for instance, particularly cruel or heinous is relevant to the determination of the appropriateness of actually imposing a death sentence on a death-eligible perpetrator*, even though the fact of cruelty or heinousness would not, of itself, be sufficient to bring the crime within the scope of any section of R.C. 2929.04(A), nor could that fact be used to cause the defendant to become death-eligible." (Emphasis added in part and deleted in part.)

{¶ 40} We now recognize that this language in *Gumm* might be construed to suggest that the nature and circumstances of an offense (such as the cruel and heinous manner in which it was committed) can be included on the *aggravation* side of the statutory weighing process. However, as we have pointed-out, the nature and circumstances of the offense may only enter into the statutory weighing process on the side of *mitigation*. See R.C. 2929.04(B). Thus, we modify *Gumm* to the extent that that opinion indicates anything to the contrary.

**{¶ 41}** Again and again and again, we hold that in the penalty phase of a capital trial, the "aggravating circumstances" against which the mitigating evidence is to be weighed are limited to the specifications of aggravating circumstances set forth in R.C. 2929.04(A)(1) through (8) that have been alleged in the indictment and proved beyond a reasonable doubt. In this regard, it is improper for prosecutors in the penalty phase of a capital trial to make any comment before a jury that the nature and circumstances of the offense are "aggravating circumstances."

*B*

*Appellant's Contentions*

**{¶ 42}** In his thirteenth proposition of law, appellant challenges a number of the prosecutor's comments during the initial closing argument in the penalty phase. However, appellant never objected to the prosecutor's remarks at the time they were made. Therefore, we find that appellant's contentions of error based upon the state's initial closing argument have been waived.[2] Accordingly, our review of appellant's contentions must proceed, if at all, under the plain error analysis of Crim.R. 52(B). Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise. See, *e.g.*, *State v. Wickline* (1990), 50 Ohio St.3d 114, 119-120, 552 N.E.2d 913, 919-920.

**{¶ 43}** In the state's initial closing argument in the penalty phase, the prosecutor discussed the three statutory aggravating circumstances appellant was found guilty of committing. In discussing the R.C. 2929.04(A)(7) kidnapping specification, the prosecutor stated:

---

2. We recognize that appellant moved for a mistrial at the conclusion of the state's initial closing argument based upon the prosecutor's alleged improper comments. The motion was denied. In this regard, appellant claims that he did "object" to the prosecutor's comments. However, "[i]mproper remarks of counsel during argument, unless so flagrantly improper as to prevent a fair trial, should be at once objected to and exception taken; otherwise error cannot be predicated upon the remarks alleged to have been improper." *State v. DeNicola* (1955), 163 Ohio St. 140, 56 O.O. 185, 126 N.E.2d 62, paragraph three of the syllabus. See, also, *State v. Johnson* (1989), 46 Ohio St.3d 96, 102, 545 N.E.2d 636, 642.

"The second aggravating circumstance becomes a lot more serious:  the kidnapping of Amber Garrett.  What I would like you to consider when you think back about that is what Amber Garrett went through during that kidnapping when she was taken out of her bed.  It was a very cold night.  All she had on was a little nightie and a pair of underwear.  She did not have her glasses, she did not have her shoes.

"At some point in time she woke up and she really did not know where she was.  She was in his car and obviously she could not see well or she might have been able to recognize him at this point.  What did she say to him?  What went through her mind as she felt that knife pressed against her neck?  We know from Dr. Kenny [the coroner] that there was not one or a couple but eleven superficial lacerations.  That would hurt.  It obviously hurt a lot.  This is a 10-year-old girl. *That is the kidnapping.  That is the aggravated circumstance*.  What went through her mind while all that was going on?  That is something to consider." (Emphasis added.)

**{¶ 44}** The prosecutor's comments in this regard could be considered objectionable for two reasons.  First, the prosecutor obviously invited the jury to concentrate on what the victim experienced and was thinking in her last moments of life.  As we recognized in *State v. Combs* (1991), 62 Ohio St.3d 278, 283, 581 N.E.2d 1071, 1077, such argument could be considered error to the extent that it invites the jury to speculate on facts not in evidence.  Second, we are somewhat troubled by the prosecutor's statements:  "That is the kidnapping.  That is the aggravated circumstance."  These statements are legally defensible since the kidnapping was, in fact, the predicate for one of the R.C. 2929.04(A) specifications of aggravating circumstances alleged in the indictment.  However, the statements were made in the midst of the prosecutor's description of some of the nature and circumstances of the crime and, thus, could be construed as suggesting that the nature and circumstances of the offense were "aggravating circumstances."  In this

regard, a much better approach[3] for the closing argument would have been to entirely separate the discussion of the statutory aggravating circumstances appellant was found guilty of committing from the discussion of the nature and circumstances of the crime. For instance, the prosecutor could have first listed the three statutory aggravating circumstances at issue in the case as specified in the indictment. *As a separate portion of the argument to the jury*, the prosecutor could have then set forth a description of all relevant facts and circumstances surrounding the offense—*without referring to any such facts and circumstances as "aggravating."* Again, we emphasize that prosecutors need to exercise an abundance of caution to avoid suggesting or implying that the nature and circumstances of the offense are "aggravating circumstances."

{¶ 45} Next, the prosecutor went on to discuss the third statutory (R.C. 2929.04[A][3]) aggravating circumstance, to-wit, a killing to escape detection. In this part of the initial closing argument, the prosecutor again invited the jury to speculate concerning the victim's thoughts as she was being stabbed to death: "Think of the savageness of the killing he actually inflicted on her; ten or eleven knife wounds, and she was again alert and aware during this, going into her chest, going into her neck when she was able to fend some of these off. There was a cut in her hand and one of the knife wounds went all the way through her arm. Again, what went through that little girl's mind at that point?" Clearly, the prosecutor should have refrained from encouraging the jury to speculate as to the victim's final thoughts. Additionally, near the conclusion of the prosecutor's initial closing argument, he stated "[a]nd what, if anything, did she do to deserve this? *Those are the aggravating circumstances*, ladies and gentlemen, that he is guilty of and that you found him guilty of." (Emphasis added.) With respect to these remarks, it is

---

3. We recognize, of course, that we have the advantage of "Monday morning quarterbacking" whereas the prosecutor was required to make his decisions and comments during the "heat of the battle." We further recognize that our job, in this regard, is much easier than was his.

not entirely clear whether the prosecutor was referring to the nature and circumstances of the offense on the one hand or to the three statutory aggravating circumstances that appellant was found guilty of committing on the other hand. In this regard, we note that prosecutors should refrain from making any vague comments in the penalty phase concerning precisely what the aggravating circumstances are in a given case. Again, the only "aggravating circumstances" at issue in the penalty phase of a capital trial are the R.C. 2929.04(A) specifications of aggravating circumstances the defendant was found guilty of committing.

**{¶ 46}** Additionally, appellant challenges a number of comments made by the prosecutor in the final closing argument in the penalty phase. During the final closing argument, the prosecutor stated, in part:

"Now what were the aggravating circumstances? * * *

"* * * Mr. Piepmeier [the prosecutor who presented the initial closing argument] explained it very eloquently what those aggravating things are. What kind of person would commit the burglary of a friend's house, knows they are not going to be there, and returns to their house to burglarize and kidnap? What kind of person is that? *What kind of aggravating circumstance is that*?

"*What kind of aggravated circumstance is it that a 31-year-old man when he's doing this burglary and right before he gets the baby-sitter out of the house on a cold November night with three small children in that apartment? Incredible aggravation.*

"*He returns and now knows nobody is there. This is aggravation.* This is balancing on the end of this scale the mitigation and it is a simple balancing test. *He returns and takes a 10-year-old girl, takes a sleeping 10-year-old girl from her warm bed which she is sharing with her little sister and her little brother. Incredible in terms of an aggravating circumstance in this crime.* He takes her sound asleep from her home or half-asleep so quickly on this freezing cold night and he removes her. *There is not time to have shoes put on her, a coat put on her*

*and she is half blind without her glasses, and what kind of aggravation is it*?  What kind of person would commit that kind of a crime?

"He throws her in the car.  We know from the witnesses and the eyewitnesses that saw this person out on the road, that saw his car on the road which was a very tight time frame.  He didn't get what he wanted from Amber and this vicious man, probably within thirty minutes of kidnapping her.

"*What aggravation do we further have?  We have these hesitation marks on Amber's neck.  I am sure you looked at and saw when you think of her.  He stabs her eleven times.  This is all on the scale side of aggravation.  He stabs this little girl eleven times.  The wound to the heart area is incredible in terms of aggravation.*

"*What did the coroner testify to?  He ran a knife in her chest, withdrew it partially and then stuck it back in her.  That is on the aggravation side against his mitigation.  This exhibit that you saw back in the jury room depicts her struggle in trying to fight him.  That is on the aggravation side.  That is on the aggravation scale.*

"He wanted to make sure though so he takes a blunt object and probably a jack handle and delivers the shots to the head.  She will never talk.  For the purpose of escaping detection, just as Mike Piepmeier said in his opening statement.  Isn't that incredibly consistent, isn't that incredibly consistent with the cleaning of the car, the cleaning of his clothes, the lies he told the police, the continued lies he told this courtroom and even the lies he told you in this courtroom today?

"*Killing Amber and that aggravation connected with it that you're weighing against his mitigation that was presented today.  He was cleaning, he was getting rid of the witness.  It is the ultimate cleaning.  It was the ultimate selfish act.  He made the decision to kill her.*"  (Emphasis added.)

{¶ 47} Initially, we note that appellant failed to raise an objection to any of the prosecutor's remarks concerning what constituted "aggravation" in this case.  Thus, appellant's arguments based upon the prosecutor's remarks have been

waived. Accordingly, our discretionary review of appellant's contentions must proceed, if at all, under the plain-error analysis of Crim.R. 52(B). See *Wickline*, *supra*, 50 Ohio St.3d 114, 119-120, 552 N.E.2d 913, 919-920.

{¶ 48} We agree with appellant that the prosecutor's final closing argument was riddled with improper comments regarding the nature and circumstances of the offense. Repeatedly, the prosecutor referred to the nature and circumstances of the offense as "aggravation" or "aggravating circumstances." Worse yet, the prosecutor stated that such "aggravation" was to be balanced against the evidence presented in mitigation. Such comments do not conform to Ohio's death penalty scheme for the reason stated in our discussion, *supra*.

{¶ 49} However, while many of the prosecutor's comments in the closing arguments (both the initial closing argument and the final closing argument) should not have been made, we nevertheless conclude that the errors did not rise to the level of plain error. We are persuaded that the prosecutor's closing arguments to the jury made no difference in the outcome of the trial, particularly in light of the statutory aggravating circumstances appellant was found guilty of committing and the lack of credible mitigating evidence presented by appellant. Moreover, the trial court properly instructed the jury that the only "aggravating circumstances" at issue in this case were the three specifications of aggravating circumstances the jury had found appellant guilty of committing. The instruction was very clear in this regard, and we assume that the jury followed the trial court's instructions.

{¶ 50} We have been strongly urged, by some, to reverse appellant's death sentence based upon the prosecution's closing arguments in this case. To do so, it is argued, would send a very strong message that any reference to the nature and circumstances of the offense as "aggravating circumstances" is not acceptable *even where, as here, there is no material prejudice to the defendant*. We decline to do so, trusting that our detailed clarification of this issue will suffice to put prosecutors and trial judges on notice of what is acceptable and what is not.

**{¶ 51}** In his sixth proposition of law, appellant contends that in its sentencing opinion, the trial court considered the nature and circumstances of the offense as "nonstatutory aggravating circumstances." With respect to this issue, the court of appeals stated, in part:

"[T]he thrust of the argument * * * concerns what Wogenstahl portrays as the unlawful conversion of the nature and circumstances of the murder from their rightful role as a mitigating factor to an unauthorized aggravating circumstance.

"Under R.C. 2929.04(B), the nature and circumstances of the offense are specifically to be considered in the sentencing process in that they are to be weighed, along with other delineated factors, 'against the [specified] aggravating circumstances proved beyond a reasonable doubt' in the guilt phase of the proceedings. It is now well accepted that what this permits a trial court to do in a given case is to decide, upon its assessment of the weight of the evidence, that the nature and circumstances of an offense have little, if any, value as a mitigating factor, and to refer to that comparative lack of value as part of the explanation given in the sentencing opinion for why the aggravating circumstances have been found to outweigh the mitigating factors beyond a reasonable doubt. See, *e.g.*, *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071 * * *.

"Our reading of the sentencing opinion in this case convinces us that the office assigned to the nature and circumstances of Amber Garrett's murder was precisely the one envisioned by the applicable statute and the case law that the statute has spawned. There was no inappropriate conversion here."

**{¶ 52}** We agree with this assessment of the issue. We are convinced that the trial court did not improperly consider the nature and circumstances of the offense as nonstatutory aggravating circumstances.

**{¶ 53}** Accordingly, for all of the foregoing reasons, we reject appellant's sixth and thirteenth[4] propositions of law.

### III

**{¶ 54}** In his twenty-third proposition of law, appellant suggests that forensic serologist Brian Wraxall lacked the proper academic qualifications to render an expert opinion concerning the HLA DQ Alpha ("Haldo Alpha") testing of the blood recovered from appellant's vehicle. We disagree.

**{¶ 55}** With respect to Wraxall's qualifications, appellant established at trial that Wraxall had no college degree and was not a medical doctor. However, "[u]nder Evid.R. 702, an expert may be qualified by *knowledge, skill, experience, training, or education* to give an opinion which will assist the jury to understand the evidence and determine a fact at issue." (Emphasis added.) *State v. Beuke* (1988), 38 Ohio St.3d 29, 43, 526 N.E.2d 274, 289. Here, the record reflects that Wraxall was educated in England where he achieved a Higher National Certificate in Applied Biology. Wraxall testified that his education in England is approximately equivalent to the Bachelor of Science degree in the United States. He has studied microbiology at a United States university and has attended numerous symposiums in the field of criminalistics. He has published several papers in the field of bloodstain analysis. From 1963 through 1977, Wraxall worked for the Metropolitan Police Forensic Science Laboratory in London. He began working for the Serological Research Institute in 1978, and has over fourteen years of laboratory experience. Additionally, Wraxall has testified as an expert in twenty states, including Ohio.

**{¶ 56}** Although Wraxall lacks a college degree and is not a medical doctor, we find that the trial court did not abuse its discretion in allowing him to testify as an expert based upon his extensive background and experience in blood analysis.

---

4. With respect to the host of additional arguments appellant has raised in his thirteenth proposition of law, we find no prejudicial errors requiring reversal of the death sentence.

Further, Wraxall's expert opinions were based on his personal testing of the blood samples that had been provided to him and, thus, the requirements of Evid.R. 703 have been satisfied.

{¶ 57} Next, appellant contends that Wraxall's testimony should have been stricken because Wraxall never offered an expert opinion that the blood recovered from appellant's vehicle was, in fact, Amber's blood. We find that appellant's arguments demonstrate a complete lack of understanding of the purposes of Wraxall's testimony. Wraxall testified to a reasonable degree of scientific certainty that the blood recovered from appellant's vehicle was consistent with the Haldo Alpha classification of a known sample of Amber's blood. He also testified to a reasonable degree of scientific certainty that the Haldo Alpha classification of Amber's blood occurs in approximately 5.3 percent of the Caucasian population. The prosecution did not offer Wraxall's testimony to establish specific identification of the source of the blood recovered from appellant's vehicle. The Haldo Alpha test was incapable of establishing specific identification. Rather, Wraxall's testimony was probative that the source of blood could have come from the victim, and was much more probative than the typical ABO blood grouping evidence that is routinely considered in criminal trials. The testimony excluded approximately ninety-five percent of the Caucasian population as potential sources of the bloodstain recovered from appellant's vehicle. Accordingly, we find no error in the admission of Wraxall's testimony.

{¶ 58} Furthermore, appellant points to the fact that the evidence at trial established that appellant had purchased the 1978 Oldsmobile on November 18, 1991, *i.e.*, approximately a week before Amber's murder. On cross-examination, Wraxall conceded that it was impossible to determine the age of the bloodstain recovered from appellant's vehicle. In this regard, appellant contends that the trial court should have excluded the bloodstain evidence since the age of the bloodstain could not be determined. However, we find that the question concerning the age of

the bloodstain goes to the weight, and not to the admissibility, of the bloodstain evidence. In any event, appellant's arguments in this regard have been waived.

{¶ 59} Accordingly, we reject appellant's twenty-third proposition of law.

IV

{¶ 60} In his twenty-fourth proposition of law, appellant challenges the trial court's refusal to suppress the testimony of two witnesses who identified appellant as the man they had seen on Jamison Road in the early morning hours of November 24, 1991. Appellant contends that the trial court erred by refusing to suppress the identification testimony of Brian Noel and Kathy Roth. We disagree.

{¶ 61} Noel initially identified appellant on Thursday, November 28, 1991, at a lineup conducted at the Hamilton County Justice Center. At that time, appellant had not been charged with a crime and, thus, was not represented by counsel. Appellant concedes that he had no Sixth Amendment right to counsel at the lineup because he had not been formally charged with a crime. See *Kirby v. Illinois* (1972), 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411. Nevertheless, appellant invites us to find that he had a right to counsel under Section 10, Article I of the Ohio Constitution. However, appellant has presented us with no compelling reasons why Ohio constitutional law should differ from the federal law on this issue. Moreover, a videotape of the lineup reveals that it was conducted in an appropriate manner. At trial, Noel positively identified appellant as the man he had seen on Jamison Road on the night in question. The trial court did not err in refusing to suppress Noel's identification testimony.

{¶ 62} Likewise, appellant has failed to demonstrate any impropriety by the state with respect to Roth's identification of appellant. In *State v. Brown* (1988), 38 Ohio St.3d 305, 310, 528 N.E.2d 523, 532, we held that "[w]here a witness has been confronted by a suspect before trial, that witness' identification of the suspect will be suppressed if the confrontation procedure was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under the totality of the

circumstances. *Manson v. Brathwaite* (1977), 432 U.S. 98 [, 97 S.Ct. 2243, 53 L.Ed.2d 140]."

{¶ 63} Police showed Roth a photo array comprised of six photographs shortly after Amber's body was discovered. Roth was unable to positively identify appellant. Almost a year later, a prosecutor showed Roth a different photo array. At that time, Roth identified appellant's picture, but expressed some reservations since appellant's face and hair as depicted in the photograph appeared "fuller" than when she had seen him on Jamison Road. Roth was then shown a single black-and-white photograph of appellant which she positively identified. At trial, Roth expressed no reservations in identifying appellant as the man she had seen on Jamison Road. Appellant suggests that the state acted improperly in obtaining Roth's identification of appellant. However, the record does not support appellant's contentions in this regard.

{¶ 64} Appellant also apparently suggests that Vickie Mozena's identification of appellant was "sufficiently uncertain" and resulted from overly suggestive police practices. However, a review of Mozena's testimony reveals that appellant's argument is completely unfounded. Mozena was shown a photo array shortly after the murder and, without hesitation, identified appellant as the man she had seen at the United Dairy Farmers store on the night of Amber's disappearance. Mozena testified at trial that she thought appellant was about to rob her when he entered the United Dairy Farmers store. Thus, Mozena had good reason to focus her attention on appellant and to remember him. Moreover, Mozena sold appellant a pack of cigarettes and had seen him in the store on at least one other occasion. At trial, Mozena expressed no doubt whatsoever that the man she had seen on the morning of November 24, 1991 was, in fact, appellant. There is no evidence to suggest that Mozena's identification of appellant was the product of impermissible police investigatory tactics.

**{¶ 65}** Accordingly, appellant's twenty-fourth proposition of law is not well taken.

V

**{¶ 66}** In his twenty-fifth proposition of law, appellant contends that the evidence is insufficient to establish his identity as the perpetrator of the crimes. We disagree. In reviewing the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573. The weight to be given the evidence and the credibility of the witnesses are issues for the jury to determine. See *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Upon a thorough review of the record, we are absolutely convinced that the evidence in this case was more than sufficient to prove appellant's guilt beyond a reasonable doubt. In this proposition, appellant essentially requests that we evaluate the credibility of witnesses and resolve evidentiary conflicts in his favor. This we refuse to do. See, generally, *State v. Hawkins* (1993), 66 Ohio St.3d 339, 344, 612 N.E.2d 1227, 1231.

**{¶ 67}** In his twenty-sixth proposition of law, appellant urges that his convictions are against the manifest weight of the evidence. However, appellant readily concedes that this court does not, generally, weigh the evidence. See *State v. Cooey* (1989), 46 Ohio St.3d 20, 26, 544 N.E.2d 895, 905-906. Therefore, having found that the evidence of appellant's guilt is legally sufficient to sustain his convictions, we reject appellant's arguments concerning the manifest weight of the evidence. Furthermore, we note, in passing, that the direct and circumstantial evidence in this case overwhelmingly establishes appellant's guilt of all charges and specifications.

**{¶ 68}** Accordingly, we reject appellant's twenty-fifth and twenty-sixth propositions of law.

VI

**{¶ 69}** Appellant had a prior (1985) aggravated burglary conviction. At trial, the state informed the court of its intention to call Officer Kent Miller to testify concerning the circumstances of appellant's prior conviction. The prosecutor stated that Miller's testimony would be used to establish the prior aggravated felony specifications in connection with Counts Two and Three of the indictment. Moreover, the prosecutor stated that "[i]n addition, Judge, we won't offer his [Miller's] testimony only for that purpose. We are also going to [R.C.] 2945.59[A] * * *, Evidence Rule 404[B], what is [oftentimes] referred to as same or similar offenses. We think that it is relevant to prove defendant's scheme, plan or system in perpetrating a particular offense, particularly this [1989] aggravated burglary." The prosecutor explained to the trial judge that the prior burglary and the burglary in this case both "involved people he [appellant] had been with or visited with the day before, and in both offenses he utilized some rouse [*sic* ruse] to get the occupant out of the home so he could commit the burglary. In either cases [*sic*] there was a sign of force and, finally, he used an alibi when he was confronted that he had gone straight home and gone to bed and didn't know anything about the burglary." The trial court ruled in favor of allowing Miller's testimony pursuant to R.C. 2945.59 and Evid.R. 404(B), and to establish the prior aggravated felony specifications in Counts Two and Three of the indictment.

**{¶ 70}** In his twenty-first proposition of law, appellant contends that the trial court committed reversible error in allowing Miller to testify concerning appellant's 1985 aggravated burglary conviction. We disagree.

**{¶ 71}** R.C. 2945.59 provides that:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in

doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

**{¶ 72}** Evid.R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**{¶ 73}** Evidence of other crimes, wrongs or bad acts independent of, and unrelated to, the offenses for which a defendant is on trial is generally inadmissible to show criminal propensity. See *State v. Woodard* (1993), 68 Ohio St.3d 70, 73, 623 N.E.2d 75, 78, and *Wickline*, *supra*, 50 Ohio St.3d 114, 120, 552 N.E.2d 913, 920. However, the evidence of appellant's 1985 aggravated burglary conviction was not used for an impermissible purpose. We agree with the court of appeals' determination that there are "striking" similarities between appellant's 1985 conviction and the aggravated burglary in the case at bar. The similarities tended to establish a number of the items enumerated in R.C. 2945.59 and Evid.R. 404(B). Thus, the evidence of appellant's prior conviction was admissible for that limited purpose. See *State v. Broom* (1988), 40 Ohio St.3d 277, 533 N.E.2d 682, paragraph one of the syllabus.

**{¶ 74}** Appellant protests that the prior offense was "dissimilar" to the aggravated burglary committed in this case. However, as we recognized in *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, syllabus, "[o]ther acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B). * * * Although the standard for admissibility is strict, the

other acts need not be the same as or similar to the crime charged." Moreover, we note that Miller's testimony concerning the prior aggravated burglary conviction was clearly admissible because the prosecution bore the burden of establishing the prior aggravated felony specification in connection with Counts Two and Three of the indictment.

{¶ 75} Accordingly, appellant's twenty-first proposition of law is not well taken.

VII

{¶ 76} Appellant was found guilty of three death penalty specifications in connection with the aggravated murder. The first specification alleged that the killing occurred during the course of a kidnapping (R.C. 2929.04[A][7]). The second specification alleged that the killing occurred during the course of an aggravated burglary (R.C. 2929.04[A][7]). The third alleged that appellant had killed Amber for the purpose of escaping detection, apprehension, trial, or punishment for having committed the aggravated burglary and/or kidnapping (R.C. 2929.04[A][3]).

{¶ 77} In his first proposition of law, appellant contends that the trial court should have merged the three aggravating circumstances prior to the penalty phase since, according to appellant, the three aggravating circumstances were duplicative. We disagree.

{¶ 78} In *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph five of the syllabus, this court held that:

"In the penalty phase of a capital prosecution, where two or more aggravating circumstances arise from the same act or indivisible course of conduct and are thus duplicative, the duplicative aggravating circumstances will be merged for purposes of sentencing. Should this merging of aggravating circumstances take place upon appellate review of a death sentence, resentencing is not automatically required where the reviewing court independently determines that the remaining

aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt and that the jury's consideration of duplicative aggravating circumstances in the penalty phase did not affect the verdict."

{¶ 79} Here, the three aggravating circumstances appellant was found guilty of committing were not duplicative. The evidence at trial, if accepted, established that appellant broke into an occupied structure to kidnap ten-year-old Amber Garrett. He forcibly removed Amber from the apartment to use her for his own sexual gratification. Appellant physically restrained Amber and bound her arms in the clothing she was wearing. A knife was held to Amber's neck. She was transported in appellant's vehicle across the Ohio-Indiana border. At some point, appellant killed Amber when he realized that he could not return her to the apartment without being identified as the perpetrator of the aggravated burglary and/or kidnapping offenses.

{¶ 80} In *State v. Waddy* (1992), 63 Ohio St.3d 424, 448, 588 N.E.2d 819, 837, we recognized that aggravated burglary is not implicit within kidnapping, and that kidnapping is not implicit within aggravated burglary. In *Waddy*, we held that although Waddy had been convicted of two R.C. 2929.04(A)(7) death penalty specifications (*i.e.*, aggravated burglary and kidnapping), the specifications were not duplicative. *Id*. We reach the same conclusion here. Further, the R.C. 2929.04(A)(3) aggravating circumstance in the case at bar can clearly be viewed as independent of the two R.C. 2929.04(A)(7) aggravating circumstances appellant was found guilty of committing. The aggravating circumstances appellant was found guilty of committing did not arise out of the same act or indivisible course of conduct. Therefore, merger was not required. Moreover, given the dearth of mitigating evidence in this case, we are convinced beyond a reasonable doubt that the jury would have reached the same verdict in the penalty phase even if the three aggravating circumstances had been merged.

{¶ 81} Accordingly, we reject appellant's first proposition of law. Similarly, we reject the arguments in support of appellant's second, third, and fourth propositions of law which assume that the aggravating circumstances appellant was found guilty of committing should have been merged at trial and on appeal.

VIII

{¶ 82} Having considered each of appellant's propositions of law, we must now independently review the death sentence for appropriateness (also raised in appellant's twenty-seventh proposition of law) and proportionality. Again, we find that the three specifications of aggravating circumstances appellant was found guilty of committing are clearly shown on the record before us.

{¶ 83} In mitigation, appellant presented the testimony of friends, family and others. The witnesses were aware of appellant's criminal history, and testified that appellant had reformed his life and had changed for the better in the months preceding the murder. In an unsworn statement, appellant proclaimed his innocence, challenged the state's evidence, and expressed sympathy to Amber's family. Defense counsel urged the jury to consider, as mitigating, that Amber Garrett died quickly and that she was neither raped nor tortured. Moreover, defense counsel urged the jury to spare appellant's life and suggested that the real killer was yet to be identified.

{¶ 84} The trial court and court of appeals apparently found no credible mitigating evidence and, upon a review of the record, neither do we. Accordingly, we find that the aggravating circumstances appellant was found guilty of committing outweigh the evidence presented in mitigation beyond a reasonable doubt.

{¶ 85} As our final task, we have undertaken a comparison of the death sentence in this case to those cases in which we have previously imposed the death penalty. We have previously imposed the death sentence in cases involving murder

during the course of a kidnapping (see, *e.g.*, *Scudder*, *supra*, 71 Ohio St.3d 263, 643 N.E.2d 524), murder during the course of an aggravated burglary (see, *e.g.*, *State v. Bonnell* [1991], 61 Ohio St.3d 179, 573 N.E.2d 1082), and murder to escape detection (see, *e.g.*, *State v. Burke* [1995], 73 Ohio St.3d 399, 653 N.E.2d 242). Appellant's death sentence is neither excessive nor disproportionate.

**{¶ 86}** Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed*.

MOYER, C.J., WRIGHT, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

_____

APPENDIX

**{¶ 87}** "Proposition of Law No. 1: Specifications under R.C. 2929.04(A)(3) and (A)(7) are duplicative, and must be merged prior to the weighing by the sentencing jury, the trial judge, and an appellate court considering the appropriate sentence in a capital case. The failure to merge such specifications constitutes a violation of the rights of the accused under the United States Constitution and the Ohio Constitution as well where the death sentence is imposed thereafter.

**{¶ 88}** "Proposition of Law No. 2: The power conferred by R.C. 2929.05 upon appellate courts to review aggravating and mitigating factors, and to determine the appropriateness of a given death sentence, is subordinate to the right of the accused to trial by jury under Art. I. §§ 5 and 10 of the Ohio Constitution.

**{¶ 89}** "Proposition of Law No. 3: Unless it can fairly be held beyond a reasonable doubt that penalty phase error in a capital trial had no effect upon the jury's sentencing verdict, appellate courts are rendered powerless by the right to trial by jury set forth in the Ohio Constitution, Art. I. §§ 5 and 10, from purporting to 'cure' the error and to affirm the death sentence; any such affirmance violates

the right of the accused to trial by jury, and the death sentence must be vacated and set aside.

{¶ 90} "Proposition of Law No. 4: The affirmance of a death sentence by an appellate court which has reweighed the aggravating and mitigating factors without merging specifications required to be merged, where the jury which recommended the death sentence upon unmerged specifications, and the trial judge also did not merge the specifications in determining the sentence, constitutes a violation of the right of the accused under the Eighth Amendment to have the death sentence imposed only after the proper procedures have been followed under the state scheme for imposing the death sentence, and also constitutes a violation of the right to due process of law in that such appellate reweighing abrogates the liberty interest created by state law, which requires jury participation in the capital sentencing process.

{¶ 91} "Proposition of Law No. 5: Where a trial court, in its opinion justifying a death sentence, incorporates verbatim therein *as the trial court's own conclusions* negative statements about the accused made in the prosecutor's opening statement five weeks prior to the sentencing proceedings, and also incorporates practically verbatim from similar opinions of other judges, and of the same judge, in prior capital cases, conclusions purportedly resulting from the sentencing process in the case at bar, then the offender has been denied his Eighth Amendment right to individualized and independent consideration by the trial court of the appropriate sentence in his case, and his Fourteenth Amendment right to due process of law.

{¶ 92} "Proposition of Law No. 6: Where, in a capital case, the sentencing court considers and weighs invalid or improper aggravating factors in imposing the death sentence, that sentence offends the Eighth Amendment to the Constitution of the United States, and the right to due process under the Fourteenth Amendment, and their counterparts in the Ohio Constitution, and must be reversed.

{¶ 93} "Proposition of Law No. 7: The defendant in a capital case is entitled to 12 peremptory jury challenges, and the restriction of the defense to 6 peremptory challenges violates Ohio law and the rights of the accused to a fair and impartial jury under the Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, and under Art. I. §§ 5 and 9 of the Ohio Constitution.

{¶ 94} "Proposition of Law No. 8: The denial of the right of the accused to jury instructions as to the mitigating factors of residual doubt and mercy violates the right of the accused to consideration by the sentencer in a capital prosecution of all relevant mitigating factors, in violation of his rights under the Eighth Amendment to the Constitution of the United States, to due process under the Fourteenth Amendment, and to his rights under the Ohio Constitution, Art. I. §§ 9 and 16.

{¶ 95} "Proposition of Law No. 9: The application against the accused by an intermediate appellate court of a change in the law occurring between the imposition of a death sentence and the decision of the appellate court to affirm, which change deprives the accused of the benefit of mitigating factors to which he was entitled when his case was tried, violates his protection against *ex post facto* laws, in violation of Art. I. § 10 of the United States Constitution, and Art. II. § 28 of the Ohio Constitution, as well as R.C. 1.48.

{¶ 96} "Proposition of Law No. 10: The trial court committed error prejudicial to appellant's Eighth Amendment and due process rights in permitting the prosecution to argue that the jury's death verdict was only a recommendation, and also in instructing the jury, and providing verdict forms to the effect that the jury's verdict was only a recommendation, and was not binding upon the trial court.

{¶ 97} "Proposition of Law No. 11: The denial of defense requests for funds to retain the services of an investigator, and for a mitigation specialist, denied appellant the right to the equal protection of the laws, secured to him by the Fourteenth Amendment to the U.S. Constitution, and rendered his death sentence

constitutionally infirm under the Eighth Amendment, as well as violating his right to due process of law under the U.S. and Ohio Constitutions.

{¶ 98} "Proposition of Law No. 12: Where the prosecution, at the penalty phase of a capital prosecution, is permitted, over objection and motions for mistrial, to adduce evidence of a single incident of a prior 'bad act' occurring ten years prior to the offense at bar, and the nature of such act, and even its existence, was not shown to have occurred; the accused was not indicted for a specification based upon such incident; and no conviction resulted from such incident, then the imposition of the death sentence was the result of unconstitutional weighing and consideration of a nonstatutory aggravating factor, the right of the accused under the Eighth and Fourteenth Amendments has been violated, and reversal of the death sentence is required.

{¶ 99} "Proposition of Law No. 13: Egregious misconduct by the prosecutor in the penalty phase of capital proceedings requires reversal of the death sentence, and where the prosecutor, in the guise of rebuttal, offers grossly prejudicial and inadmissible evidence of a nonstatutory aggravating factor, and his final argument for death argues nonstatutory aggravating factors, misstates the evidence, contains inflammatory remarks and invective against the accused and his counsel, a death sentence based on a jury verdict following such arguments violates due process and the Eighth Amendment of the United States Constitution, and their counterparts in the Ohio Constitution.

{¶ 100} "Proposition of Law No. 14: It is error for the trial court in a capital prosecution to refuse a defense request to submit a questionnaire promulgated by defense counsel to prospective jurors prior to voir dire, in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. §§ 9 and 16 of the Ohio Constitution.

{¶ 101} "Proposition of Law No. 15: It is error for the trial court in a capital prosecution to refuse a defense request to conduct individual, sequestered voir dire,

in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. §§ 9 and 16 of the Ohio Constitution.

{¶ 102} "Proposition of Law No. 16: It is error for the trial court in a capital prosecution to refuse a defense request to argue first and last to the jury at the penalty phase of the prosecution, in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. §§ 9 and 16 of the Ohio Constitution.

{¶ 103} "Proposition of Law No. 17: It is error for the trial court in a capital prosecution to refuse a defense request for separate juries for the guilt and, if necessary, the penalty phases of the prosecution, in violation of the rights of the accused under the Eighth and Fourteenth Amendments to the Constitution of the United States, and Art. I. §§ 9 and 16 of the Ohio Constitution[.]

{¶ 104} "Proposition of Law No. 18: The Ohio death penalty statutes are unconstitutional, violating the Eighth and Fourteenth Amendment proscription of cruel and unusual punishments, the Fourteenth Amendment guarantees to due process of law and to the equal protection of the laws, and also violating the concomitant provisions of the Ohio Constitution.

{¶ 105} "Proposition of Law No. 19: A conviction and death sentence for aggravated murder must be reversed as violations of the fundamental fairness required by the Due Process Clause of the Fourteenth Amendment, and the Sixth Amendment of the right to trial before a fair and impartial jury, as well as their counterparts in the Ohio Constitution, as well as the Eighth Amendment prohibition against cruel and unusual punishment, where the conviction and death sentence were obtained through use of repetitive, cumulative, photographs of the corpse of the deceased, the net prejudicial effect of which far outweighed their probative value.

{¶ 106} "Proposition of Law No. 20:  Unless and until the accused puts his character in issue, it is improper, prejudicial error to permit the state to present evidence in its case in chief purporting to demonstrate that the accused is a bad person, in violation of the right of the accused to due process of law and to a fair and impartial jury, under the Sixth and Fourteenth Amendments, respectively, to the Constitution of the United States, and, where a death sentence is the result of the proceedings, in violation of the Eighth Amendment as well; similar rights protected by the Ohio Constitution were similarly violated.

{¶ 107} "Proposition of Law No. 21:  It is prejudicial error, and a violation of the right of the accused to due process of law, secured by the Fourteenth Amendment to the Constitution of the United States, to admit evidence of a prior offense which is temporally remote, and not at all similar to the offense in the case at bar, under the purported 'same and similar act' exception to the general rule that evidence of prior criminal conduct is not admissible to prove an element of the subsequent offense then being tried.

{¶ 108} "Proposition of Law No. 22:  A death sentence must be reversed as contrary to the Revised Code, as well as the Eighth Amendment, where the trial court fails to instruct the jury that the aggravating circumstance under R.C. 2929.04(A)(7) contains two mutually exclusive alternatives, and thus permits conviction of the aggravating circumstance upon less than a unanimous vote of the jury; such an error is also an independent violation of the right of the accused to due process of law; similar rights secured by the Ohio Constitutional [*sic*] are also violated thereby.

{¶ 109} "Proposition of Law No. 23:  Admission of an expert opinion with respect to a Haldo-Alpha blood test insufficient to establish to a reasonable scientific certainty that blood found in the defendant's auto was that of the deceased victim, where the expert possesses insufficient expertise, and where the defendant owned to [*sic* the] auto for but three days prior to the offense, and where the blood

removed from the defendant's auto could have been there as long as ten years, is prejudicial error, and a denial of due process.

{¶ 110} "Proposition of Law No. 24:  Where the identification of the accused by a witness is the result of overly suggestive police investigative tactics, the refusal of the trial court to suppress the witness' identification testimony violates the right of the accused to due process of law, requiring reversal.

{¶ 111} "Proposition of Law No. 25:  Where the state fails to prove beyond a reasonable doubt that the accused is the perpetrator of the crimes with which he has been charged, convictions for aggravated murder, aggravated burglary and kidnapping, and the capital specifications attendant thereto, must be reversed as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

{¶ 112} "Proposition of Law No. 26:  Convictions for aggravated murder which are contrary to the manifest weight of the evidence must be reversed, as contrary to the right of the accused to due process of law under the Ohio and federal Constitutions.

{¶ 113} "Proposition of Law No. 27:  The aggravating circumstances appellant was found guilty of violating do not outweigh the mitigating factors, and hence the death sentence imposed upon appellant violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution, and violate Ohio law as well.

{¶ 114} "Proposition of Law No. 28:  Where convictions of capital murder and related offenses is [*sic*] tainted by prejudicial prosecutorial misconduct which deprives the accused of a fair trial, those convictions violate the fundamental fairness required by due process, and the conviction must be reversed as violative of the Ohio and federal Constitutions.

{¶ 115} "Proposition of Law No. 29:  A death sentence following a verdict of a jury from which one or more venirepersons were improperly excused because

of their views with respect to capital punishment violates the right of the accused to a fair and impartial jury under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and their counterparts under the Ohio Constitution.

{¶ 116} "Proposition of Law No. 30: Where one on trial for a capital crime is denied the effective assistance of counsel, in violation of his right thereto under the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States, and under the Ohio Constitution, Art. I. § 10, his conviction and sentence must be reversed.

{¶ 117} "Proposition of Law No. 31: Where appellate counsel fail to raise on appeal the issue of ineffectiveness of trial counsel in failing to object to prejudicial prosecutorial misconduct in argument, the accused has been denied the effective assistance of appellate counsel secured to him by the Sixth and Fourteenth Amendments to the Constitution of the United States, and by Art. I. § 10 of the Ohio Constitution.

{¶ 118} "Proposition of Law No. 32: Where, during a criminal trial, there are multiple instances of error, and the cumulative effect of such errors deprives the accused of a fair trial and undermines the reliability of the conviction and the sentence of death imposed upon a jury verdict, the rights of the accused to due process and to be free from cruel and unusual punishment, under the Fourteenth and Eighth Amendments, respectively, of the United States Constitution, and their corollaries in the Ohio Constitution, have been violated, requiring reversal.

{¶ 119} "Proposition of Law No. 33: To comport with due process under the United States and Ohio Constitutions, and the Ohio capital statutes, for purposes of proportionality review, death sentences must be compared with all other cases within the jurisdiction in which the death sentence was imposed, as well as those capital cases in which it was not imposed."