DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is from the July 31, 2002 judgment of the Wood County Court of Common Pleas which sentenced appellant, Joseph Alexander, following his conviction of felonious assault (R.C. 2903.11(A)), kidnapping (R.C. 2905.01(B)), and tampering with
 {¶ 2} evidence (R.C. 2921.12). Appellant was sentenced to the maximum prison term for each offense, with the sentences to be served consecutively for a total imprisonment of twenty-three years. Upon consideration of the assignments of error, we affirm the decision of the lower court. Appellant, Joseph Alexander, asserts the following assignments of error on appeal:
 {¶ 3} "I. The trial court erred in sentencing defendant to the maximum sentence.
 {¶ 4} "II. The trial court committed reversible error in sentencing defendant to consecutive sentences.
 {¶ 5} "III. Defendant's conviction was not supported by the sufficiency of the evidence.
 {¶ 6} "IV. The court violated defendant's constitutional right to due process by instructing the jury on complicity when defendant was not charged with complicity.
 {¶ 7} "V. The trial court erred in its instructions to the jury resulting in an unfair trial for defendant."
 {¶ 8} The parties stipulated to the following facts. Fred Smith was attacked on July 20 or 21, 2001 and his injuries constitute serious physical harm as defined by R.C. 2901.01(A). This attack began at Wooley Bulley's Tavern in Findlay, Ohio, and continued to 215 East North Street, Fostoria, Ohio, and ended with Smith's death at or near Tank Farm Road, Cygnet, Ohio. Furthermore, the parties stipulated that Smith was not released by his kidnappers in a safe place unharmed.
 {¶ 9} The prosecution submitted the following evidence at trial. Denise Smith, Smith's wife, described her husband as having been over six feet tall, weighing 190 pounds, and having a very slight build. She testified that he left home on Thursday, July 19, 2001, to attend a trapshooting event in Findlay, Ohio. He drove her dark blue Blazer SUV with a gray interior. She also testified that she spoke to Smith around midnight on Thursday and that he said that he was planning to meet the family for a reunion in Columbus, Ohio, at noon on Saturday. When her husband did not show up for the reunion and she was unable to contact him, Denise Smith called one of her husband's friends at the trapshoot. Dean Townson, who had been shooting with Smith, told her that he knew Smith planned on going to the reunion because he had gone on the computer to find the best route to get there. Furthermore, she testified that while her husband would have known where Fostoria, Ohio, was located, she did not believe that he would have known the downtown area.
 {¶ 10} Cori Burchnell, the manager of Wooley Bulley's Nightclub for two years, testified that she was working that weekend. She started working about 8:30 p.m., July 20, 2001, and worked until 3:30 a.m. on July 21, 2001. She observed a man, she later identified as Smith, and his two friends come into the bar sometime before midnight. She remembered that Smith drank two drinks and thought that he must not have been much of a drinker because he wanted extra orange juice in his drink and drank slowly. Burchnell
 {¶ 11} also observed a blond woman in her late 20s or early 30s, she later identified as Tabitha Ulsh, approach the group and sit down next to Smith to talk to him. Ulsh ordered two shots of Apple Pucker, a drink that was not too strong. Burchnell served the drinks in shot glasses and then poured them into bigger glasses at Ulsh's request. Burchnell assumed that Ulsh wanted to sip on the drinks rather than take them as a "shooter". The drink sat there for awhile. Burchnell noted that Ulsh had her right hand slightly over Ulsh's purse and the two glasses. Burchnell thought it looked like Ulsh had put something into the drinks. Because Ulsh's movements looked odd, Burchnell asked the other bartender whether he had seen Ulsh's actions and whether it looked weird. He had the same impression. When Smith and Ulsh got up to dance, the other bartender decided to switch the drinks to see if Ulsh would notice. Burchnell and the other bartender got busy again and she did not see what Ulsh did. But, Burchnell did later see Ulsh move the glasses and twist them around a couple of times so that Burchnell could not keep track who had which glass. Over a long period of time Ulsh kept talking to Smith trying to get him to drink the shots. In the meantime, Smith's friends had left the bar. A few minutes before Smith and Ulsh left the bar, Ulsh ordered another drink and Smith drank the two glasses of Apple Pucker.
 {¶ 12} Jessica Sturgill testified that she, Jonathan Tornow, and seven friends went to a movie on Friday, July 20, 2001. Around 2:00 a.m., the group returned to her aunt's home in the 200 block of East North Street. Sturgill and Tornow went to a nearby restaurant to
 {¶ 13} pick up some food. As they were approaching her aunt's home on their return from the restaurant, she heard Tornow make an exclamation and asked him what he was talking about. As she parked her van, she heard some people talking near a vehicle parked less than a parking space away. There was a street light a short distance from the area but some of the light was blocked by the trees. The lights of her van were on for a few seconds until Tornow told her to turn them off. She heard a person swearing and saw three people standing around a light-colored SUV. She had told the police that it was a white SUV. A pair of tennis shoes were hanging out of the rear door. There were two men and one woman standing near the vehicle. A white man stood behind the opened door, a white woman stood in front of the door, and an African American man, with braided hair that fell to below his shoulders, stood behind her. The woman appeared to be putting someone into the back seat. Sturgill testified that the African American man approached her van and Tornow exited the van. She heard the man tell Tornow in an aggravated tone several times: "You didn't see nothing, right? Right?" Tornow acknowledged that he didn't see anything. The same man then walked to her side of the van and opened the door. She immediately said that she had not seen anything either because she knew that he was going to ask her the same thing and she was scared. He said: "Are you sure?" and looked at her for a minute. She said she was sure and then he left. Sturgill and Tornow went into her aunt's home. Sturgill identified appellant as the man who had approached her van. Sturgill also saw a man on a bike just standing nearby but he left before appellant approached her van.
 {¶ 14} Jonathan Tornow testified that he is a convicted felon for trafficking in cocaine. These charges were pending in July 2001. The prosecution informed the Seneca County prosecutor that Tornow had cooperated with the prosecution in this case. After his conviction, Tornow was placed on probation.
 {¶ 15} Tornow testified that as he and Sturgill waited at the light at the corner of East North Street and Main Street, he looked to his left toward the aunt's house. He saw a scuffle going on near the home. There looked like four or five people on the sidewalk fighting. As they approached, he recognized appellant, Justin Doll, and Jimmie Woodland Tornow had known appellant seven or eight years since having met him at school. He saw the group beating on someone laying on the ground. They were kicking and stomping the person with their feet. Tornow saw appellant kick the person repeatedly. The person on the ground was not defending himself. As they reached the aunt's home, Tornow saw Jimmie Woodland jump into the passenger side of the truck they were driving. Justin Doll walked toward a bicycle. As Sturgill parked, Tornow saw the other three people putting the person in the back of a Blazer truck. He saw appellant push the person's legs into the Blazer and close the door. When appellant approached Tornow to talk to him, Tornow took appellant's statements as a threat. Upon cross-examination Tornow could not recall having told the police that he did not see the particulars of the fight that night. He also told the police that he had not been frightened by appellant's comments, but he testified that he felt threatened.
 {¶ 16} Justin Doll testified that he had been friends with appellant for a long time. He was with appellant at his home on Perry Street on July 20, drinking since 10:00 p.m. Later that night they went to a neighborhood bar with Adam McBride. When they found that the bar was closed, they went to a carryout but there was no one there. They then went to North Street and Doll was heading to his house on North Street. Doll was riding a bike at the time and the other two men were walking. As they were walking along North Street, Doll saw a man, he later identified as Smith, come running toward them looking like he needed help. Doll saw a new blue Blazer come around the corner. He then heard someone who sounded like Ulsh, the girlfriend of appellant's brother, Jimmie Woodland, yell "Get him Joe." Doll saw appellant grab Smith in a headlock and Smith fell down but was not knocked unconscious. Appellant kicked Smith once in the head. Smith tried to cover himself. Then Woodland and Ulsh got out and started kicking Smith too. Appellant told Woodland to stop because he was beating on Smith. Doll thought that Smith looked like he was unconscious. Doll did not see any blood. Woodland stopped hitting Smith and got back into the Blazer but had to get out again to help Ulsh pick up Smith. Doll testified at trial that appellant also helped carry Smith to the Blazer. However, Doll had told the police that appellant had not helped. Doll saw appellant approach Tornow's van that had pulled up just as they were finishing loading Smith into the Blazer. Appellant talked to the people in the van for a few minutes and then walked away. Once Smith was loaded in the back seat, Woodland and Ulsh took off down the alley in the Blazer.
 {¶ 17} Doll testified that he saw Earl Williams come out of his house and observe part of the events that night before walking away. Doll also testified that Jason Swisher, who was sitting on a bicycle nearby, refused to help Ulsh and told everyone else that they were crazy to participate. As they walked away, Doll asked appellant what the incident was all about and appellant said that he did not know. Doll also testified that he originally told the police that appellant did not get involved because he was trying to protect appellant.
 {¶ 18} Raymond Noykos, who lives on 226 East North Street, testified that he lives on the alley. He testified that he heard the commotion that night and looked outside. He could see three or four people beating someone who was not defending himself. The fight was about 35 yards from his home. He stated that the area where the fight occurred was dark and that he could not see the people well enough to describe them. He saw one or two of the people pick up the person and put him in the back of the truck. The person appeared to be unconscious. Noykos called the police at this point. Noykos identified a photograph of Smith's Blazer SUV as the one he had seen that evening. He also saw someone get into a red Chevy pick-up sitting behind the Blazer who left at the same time the Blazer did.
 {¶ 19} Shannon Jones testified that she lives at 215 East North Street in Fostoria. She found a pair of small wire-framed glasses in front of her house the afternoon of July 20 or 21, 2001. The glasses were folded up and sitting on top of a cement wall. She turned the glasses over to the police.
 {¶ 20} Norma Fox, the records clerk for the Fostoria Police Department, testified that she overheard officers talking about bloody glasses left at the scene of a crime. After reading about a missing person who was described as wearing glasses, she checked to see whether any glasses had been turned into the lost and found department. She retrieved a pair of glasses in an envelope and could see through the envelope that the lenses had blood on them. She kept the glasses locked in her desk until she turned them over to a Findlay detective. She identified the glasses introduced at trial as the glasses she had retrieved.
 {¶ 21} Jay Myers and David Young, detectives with the Findlay Police Department, testified that they participated in the investigation of this case. Together, they retrieved the glasses from Officer Fox. They further investigated the area where the glasses were found and found dried blood stains near the street-lawn area. The stain did not appear to have been formed by dropping blood, but by blood flowing from someone laying on the ground. They also observed an approximately two-foot smear of blood between that point and the street. They retrieved hair from the dried blood stains, which they believed indicated that someone had impacted that area.
 {¶ 22} Mandy Owens, the mother of appellant's child, testified that she has known appellant for two years. They broke up two weeks after the child was born on June 29, 2001. Before the break up, Owens and appellant spoke daily. Owens identified a picture of appellant with his hair in long braids as being an accurate depiction of what he looked like on July 21, 2001.
 {¶ 23} Owens testified that appellant called her about 5:30 a.m. on Saturday, July 21, 2001, asking for a ride. She said no, but he insisted saying that it was really important. She arrived at appellant's house five minutes later and parked in front of the house. While she waited, Ulsh pulled up in a blue Blazer SUV, parked on the opposite of the street, and went into appellant's house. Owens knew Ulsh through appellant's brother, Jimmie Woodland She watched Ulsh through the screen door as Ulsh took off all of her outer clothing and went upstairs. Owens could not see if Ulsh took the clothes with her. Owens then saw Jimmie Woodland get into the driver's seat of the blazer and drive away. She did not see where Woodland had come from. Appellant and Adam McBride came out of the house and appellant asked Owens to open the trunk. Appellant then put a garbage bag into the trunk and got into the car. McBride got into the back seat. Appellant told Owens to drive to the Dairy Mart gas station, which was a few minutes drive from his home. Appellant purchased a small gas can which Owens identified at trial. After filling up the gas can, appellant directed her to drive to an area near some railroad tracks out in the country. Appellant and McBride got out of the car. Appellant took the garbage bag and poured gasoline over it and lit a fire. Appellant told Owens to drive to a gas station to buy some cigarettes. She then took appellant and McBride home and went home herself. She did not ask any questions because she did not want to know what was going on. However, when questioned by the police, she produced the gas can and showed them where the garbage bag had been burned.
 {¶ 24} Appellant called Owens on the following Tuesday and asked her to bring their daughter to his house. At first, he did not say anything to her. Then he said, "I'm accessory to murder." (sic) "I beat a guy up." She questioned him more, but he did not talk about it again. Later, appellant spoke to her and asked her to forget what she saw since she did not want to testify. Owens told appellant that she could not do that.
 {¶ 25} John Helm, an investigator for the Wood County Prosecutor's Office, testified that he investigated the scene where officers found Smith's body. Helm testified that the task force determined that Smith was murdered at the grave cite near Cygnet in the early morning of hours of July 21, 2001. They concluded that Smith had been beaten with a shovel, which was found nearby broken and covered with blood and hair.
 {¶ 26} Stacy Shipman, a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation, testified that she examined the evidence submitted in this case: the burned clothing, a gas can, and a partial plastic card. Through one test, she was able to determine that human blood was probably present on a sock and one of the tennis shoes. She did not test the shoes to determine if they had been cleaned or had any other chemicals on them.
 {¶ 27} Cassandra Agosti, a forensic scientist for the Ohio Bureau of Criminal Identification and Investigation, testified that she was unable to obtain a DNA standard from Smith's decomposed body and had to use a sample from his mother and father. From her DNA testing she concluded that the DNA profile from the blood samples taken
 {¶ 28} from the burnt clothing and shoes were consistent with the DNA profile of a child of Smith's parents, excluding all but 1 in 116 million Caucasian couples. She also determined that the partial blood profile she was able to obtain from one of the shoes was a mixture of blood consistent with appellant's blood profile. She did not obtain any of Smith's blood from that same shoe. However, there was another type of blood detected. Because of the small size of the sample, she was unable to conduct full DNA testing on it.
 {¶ 29} Cynthia Beisser, M.D., the deputy coroner of Lucas County, testified that she performed Smith's autopsy. She observed that he had suffered extensive head trauma and had superficial sharp force injuries on his side. She believed that Smith had been struck at least three times in order for all the observed fractures to have occurred. She concluded that Smith died from the blunt head injury. She also testified that the shovel found with the body could have caused the type of injuries she observed. She believed that such injuries would have killed Smith within a matter of minutes.
 {¶ 30} A toxicology exam revealed that Smith had an alcohol level of at least .23, approximately three times the legal limit, and evidence of Benadryl at a toxic level. Furthermore, she testified that the combined drug intoxication would have significantly affected Smith's ability to defend himself, run away from his attackers, or think normally.
 {¶ 31} In his defense, appellant called Glyn Kidd, a Fostoria police detective, to testify. He testified that he questioned Tornow on July 25, 2001, and then videotaped a second
 {¶ 32} interview the next day. During the first interview, Tornow stated that appellant was involved in the beating of a white person and helped load his body into the back seat of the Blazer. Tornow did not know if the victim was a man or a woman. Tornow also stated to Kidd that appellant told Tornow, "You didn't see nothing, right?" Tornow also stated that he knew that Ulsh and Woodland needed transportation to Mexico and Tornow thought that they were robbing the person. After their conversation, Tornow refused to put his statement in writing and requested that Kidd help him with a drug trafficking charge. After Kidd agreed to contact the Seneca County prosecutor on Tornow's behalf, Tornow returned the next day to make a videotaped statement. Kidd testified that Tornow gave generally the same statement as the day before.
 {¶ 33} The defense also called David Barnes, a special agent for the Ohio Bureau of Criminal Identification and Investigation, to testify. He testified that he found a significant amount of splattered and pooled blood stains in the Blazer which indicated that a bleeding person had impacted the rear seating area of the car. He also found that some of the stains had been diluted by an attempted cleaning of the car.
 {¶ 34} In his first assignment of error, appellant argues that the trial court erred by sentencing appellant to the maximum sentence. Appellant argues that the record does not support a finding that he committed the worst form of felonious assault. He argues that the evidence indicates only that he was drawn into the incident when Ulsh yelled for appellant to stop Smith; that there was only evidence that appellant kicked Smith; and
 {¶ 35} that there was no evidence of what injuries appellant caused to Smith. With respect to the other offenses, kidnapping and tampering with evidence, appellant also argues that he should not have been given the maximum sentences based upon the record.
 {¶ 36} The court is not required to impose the shortest prison term if it finds on the record that "the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B)(2) (Eff. 7/8/02). However, the court cannot impose the maximum sentence unless if finds on the record that the offender "committed the worst forms of the offense," or the offender posed "the greatest likelihood of committing future crimes." R.C. 2929.14(C) (Eff. 7/8/02). The trial court's findings must be supported by clear and convincing evidence.State v. Quinn (1999), 134 Ohio App.3d 459, 462. Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 37} In its sentencing order, the court stated that it was sentencing appellant to the maximum imprisonment term allowed under each offense because the shortest sentence would "demean the seriousness of the offender's conduct and will not adequately protect the public from future crime by the offender." The court also stated that "[b]ased upon the court's prior discussion of the seriousness and recidivism factors, the Court finds that the offender committed the worst form of the offense and that this offender poses the greatest likelihood of committing future crimes."
 {¶ 38} At the sentencing hearing, the court, in considering the seriousness of the offense, noted the presence of the following statutory factors indicating that the offenses of which appellant was convicted of violating were the most serious forms of those offenses. First, the court noted that appellant's assault of Smith was exacerbated because Smith was drugged and dazed when he met appellant (R.C. 2929.12(B)(1)). Second, the court noted that Smith suffered serious physical harm because of appellant's assault. (R.C. 2929.12(B)(2). Third, the court found that in connection with the tampering with evidence offense, that the offense was "committed * * * as a part of an organized criminal activity." R.C.2929.12(B)(7). Fourth, the court found that none of the statutory factors pointing toward a less serious offense were present. Finally, the court found that several of the recidivism factors of R.C. 2929.12(D) were present: appellant's lengthy juvenile record; appellant's pattern of drug or alcohol abuse and underage consumption; and appellant's lack of remorse.
 {¶ 39} We find no merit to appellant's contention that he did not commit the most serious form of felonious assault. Appellant mischaracterizes the facts when he states that that he only participated by stopping Smith when asked to do so and by kicking Smith. Instead, the evidence reveals that appellant, without question or hesitation, helped subdue and beat Smith when he was drugged and dazed and then helped to load his unconscious and bleeding body into his vehicle. Witnesses testified that Smith did not even defend himself from appellant's attack. Appellant relies significantly on the fact that he did not
 {¶ 40} know what was happening and was drawn into the incident by chance. This, however, is a critical factor indicating the severity of his conduct. Appellant had no relationship to Smith and no reason whatsoever to mercilessly beat him and then help others to load his body into a car so that Woodland and Ulsh could cause him further harm.
 {¶ 41} With regard to the other offenses, we find that the trial court's determinations that appellant committed the most serious form of kidnapping and tampering with evidence were also supported by this same evidence.
 {¶ 42} Appellant's first assignment of error is not well-taken.
 {¶ 43} In his second assignment of error, appellant argues that the trial court erred by imposing consecutive sentences without first making the findings required by R.C. 2929.14.
 {¶ 44} R.C. 2929.14(E)(4) provides as follows:
 {¶ 45} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 46} "(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 47} "(b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 48} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 49} R.C. 2929.19(B)(2)(c) requires that the court state its reasons for imposing consecutive sentences.
 {¶ 50} With respect to the consecutive sentences the court stated in the sentencing judgment that:
 {¶ 51} "The Court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender; that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public; that the harm caused by multiple offenses was so great and unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct; and that
 {¶ 52} the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 53} Appellant contends that the court merely recited the language of the statute without making a separate factual analysis and findings to substantiate its finding that consecutive sentences were warranted. We find that his argument lacks merit. At the sentencing hearing, the court discussed the seriousness of this crime, the facts that indicated that recidivism was highly probable, appellant's extensive juvenile record, appellant's alcohol abuse, and appellant's conduct during the course of the crimes. Each of the court's justifications for consecutive sentences was supported by the facts of this case and appellant's history.
 {¶ 54} Appellant's second assignment of error is not well-taken.
 {¶ 55} In his third assignment of error, appellant argues that there was insufficient evidence to support his conviction of felonious assault and that the conviction was contrary to the manifest weight of the evidence. He contends that there was no evidence that he knew that stopping Smith was going to cause him serious physical harm.
 {¶ 56} The standard for determining whether there is sufficient evidence to support a conviction is whether the evidence admitted at trial, "if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a
 {¶ 57} reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus; and State v. Thompkins
(1997), 78 Ohio St.3d 380, 386. Therefore, the verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact.
 {¶ 58} Even if there is sufficient evidence to support the verdict, the appellate court may decide that the verdict is against the weight of the evidence. State v. Thompkins, supra at 386-390. A challenge to the weight of the evidence questions whether the greater amount of credible evidence was admitted to support the conviction than not. Id. at 387. When determining whether a conviction is against the manifest weight of the evidence, "`[t]he court in light of the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. at 387 quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. While the appellate court considers the credibility of the witnesses in determining the weight of the evidence, the determination of the credibility of the witness remains within the province of the jury. Statev. DeHass (1967), 10 Ohio St.2d 230, 227, and State v. Gibson, 6th Dist. No. S-02-016, 2003-Ohio-1996, ¶ 26.
 {¶ 59} The elements of felonious assault are knowingly causing serious physical harm to another. R.C. 2903.11(A)(1). A person acts knowingly when "* * * he is aware that his
 {¶ 60} conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Furthermore, R.C.2923.03(A)(2) provides that: "No person, acting with the kind of culpability required for the commission of an offense, shall * * * aid or abet another in committing the offense."
 {¶ 61} In this case, witnesses testified that appellant stopped Smith at Ulsh's request; he participated in the beating of Smith until Smith was unconscious; and he helped to load Smith's body into the Blazer. Viewing this evidence in a light most favorable to the prosecution, we find that any rational trier of fact would have found the essential elements of the crime of felonious assault were proven beyond a reasonable doubt.
 {¶ 62} Furthermore, we also find that the felonious assault conviction was not contrary to the manifest weight of the evidence. While there was conflicting evidence as to whether appellant kicked Smith only once or participated in the beating of Smith until he was unconscious, the conflict was resolved by a determination of the credibility of the witnesses. Doll, appellant's friend and companion at the time of the crime, testified that appellant had kicked Smith only once. Tornow, who recognized appellant from school, testified that appellant repeatedly kicked Smith. Furthermore, Tornow testified that appellant threatened him not to tell anyone what he had seen. We cannot find that the jury clearly lost its way in resolving this conflict.
 {¶ 63} Appellant's third assignment of error is not well-taken.
 {¶ 64} In his fourth assignment of error, appellant argues that the trial court violated his right to due process under the Ohio and United States Constitutions by instructing the jury on the complicity when he had not been charged with the crime of complicity.
 {¶ 65} Appellant's argument is without merit. The indictment of appellant as a principal offender and R.C. 2923.03(F) gave appellant notice that the jury might be instructed on the crime of complicity, if the evidence at trial supported it, even though he was only charged as a principal offender in the indictment. Hill v. Perini (6th Cir., 1986),788 F.2d 406, certiorari denied (1986) 479 U.S. 934, and State v.Herring, 94 Ohio St.3d 246, 251, 2002-Ohio-796, certiorari denied (2002), 537 U.S. 917.
 {¶ 66} Appellant's fourth assignment of error is not well-taken.
 {¶ 67} In his fifth assignment of error, appellant argues that the trial court committed plain error when it failed to provide the jury with verdict forms that would indicate whether appellant was convicted as the principal offender or as a complicitor. Appellant failed to present this objection at trial but did object to the complicity instruction. Appellant argues that the form of the verdict does not guarantee that the jury unanimously agreed on a single theory of guilt.
 {¶ 68} Plain error is found only in exceptional cases in order to prevent a manifest miscarriage of justice. State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus, certiorari denied (1984), 465 U.S. 1106. Plain error will be recognized where,
 {¶ 69} but for the error, the outcome of the trial would have been different. Crim.R. 52(B) and State v. Wogenstahl (1996), 75 Ohio St.3d 344,357.
 {¶ 70} We agree with appellee that there was no need for separate verdict forms because there is no distinction between a defendant convicted of complicity or as a principal offender. R.C. 2923.03(F) provides that a complicitor may be "* * * prosecuted or punished as if he were a principal offender. * * *" Therefore, the use of a single verdict form was not prejudicial to appellant. State v. Luke (Feb. 1, 1999), 3rd Dist. App. No. 4-98-13.
 {¶ 71} Appellant's fifth assignment of error is not well-taken.
 {¶ 72} Having found that the trial court did not commit error prejudicial to appellant, the judgment of the Wood County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the court costs incurred on appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Peter M. Handwork, P.J., Richard W. Knepper, J., and Judith Ann Lanzinger, J., concur.