DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas which, following a jury verdict, entered judgment against appellant Derrick Jones and sentenced him for grand theft and receiving stolen property. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} In 2003, appellant was indicted for grand theft, a fourth degree felony, two counts of receiving stolen property, fourth degree felonies, and two counts of tampering with vehicle identification numbers, fifth degree felonies. The grand theft charge and one count of receiving stolen property stem from the theft of a charter tour bus from Lakefront Lines in Toledo, and the other receiving stolen property charge stems from being in possession, in Lucas County, Ohio, of a charter tour bus stolen from Ground Transportation Specialists in Michigan. The two charges for tampering with vehicle identification numbers also stem from the theft of those two buses. One count of receiving stolen property and one count of tampering with vehicle identification numbers were dismissed prior to trial.
 {¶ 3} On April 27, 2003, a charter tour bus was stolen from Ground Transportation Specialists in Taylor, Michigan. The last driver had left the key on the bus. On May 15, 2003, at approximately 3:30 a.m., a charter bus was stolen from the Lakefront lot in Toledo, Ohio. Appellant had worked for both of these companies in the recent past. When he left Lakefront, he never returned his bus key. Lakefront's keys are master keys that fit all buses in the fleet.
 {¶ 4} Several witnesses discussed standard practices in the charter bus industry. They testified that people in this business often know each other and cooperate by supplying buses to other companies for charter. For example, one witness testified that if all of a company's buses are out and it receives a call for another charter, that company will call another company to see if the second company has any buses available. Lakefront charters out its buses to other companies in this fashion but will only allow Lakefront drivers to drive Lakefront buses.
 {¶ 5} In May 2003, Troy Heathcock, the owner of Overland Travel in Adrian, Michigan, received a call from an individual identifying himself as Derrick Jones from New Transportation out of Toledo, Ohio. This individual asked if Overland had a bus available, and Heathcock replied that none of Overland's buses were free. According to Heathcock, Jones then told him that he had a new company in Toledo and owned two buses. He asked Heathcock to call if he ever needed a bus, and he gave his phone number. Within a week or so, Paul Feasel, the president of Bliss Charters in Fostoria, Ohio, called Heathcock looking for a bus. Heathcock did not have one available but gave appellant's name and number to him.
 {¶ 6} Paul Feasel also testified, explaining how he had met appellant. Feasel explained that on April 30, 2002, he was handling a charter of high school students for a track meet and was parked, taking a break, when a Shortway bus drove up and parked nearby. He observed appellant walk over to the Bliss bus and begin writing down certain numbers he was reading from the side of the bus. Feasel got off the bus and began talking with appellant. Appellant asked if Bliss was hiring any drivers. The next day, appellant called Feasel at his office and inquired about job opportunities at Bliss. Feasel replied that they might have a part-time position available. He apparently did not hear from or about appellant until the next year, when Troy Heathcock from Overland Travel told him that an individual named Derrick Jones had started a company called New Transportation.
 {¶ 7} Next, Darrin York, the owner of Pegasus Tours in Harrison Township, Michigan, testified. York does not own any buses, so when he needs one for a charter, he charters from another company. He explained that he had a charter to take a group of school children to Mackinaw Island on May 15, 2003, and had a bus from Ground Transportation lined up for it. Three weeks before the trip, he received a call from Greg Schmitt at Ground Transportation explaining that the bus York had booked for the May 15 Mackinaw trip was not available because it had been stolen.
 {¶ 8} Since May is a very busy month in the charter bus industry, York had to call several companies to find another bus. When he was unsuccessful with his usual contacts, he began to consider using companies with whom he had not previously done business. He finally called Troy Heathcock from Overland Travel. Heathcock did not have a bus available but told York he should try a new company called New Transportation owned by Derrick Jones. York called appellant, who explained that one of his buses was out of town and one was in the shop for repairs to the air conditioning. However, he expected the air conditioning to be fixed by the time of the trip, and he agreed to let York take that bus to Mackinaw Island. Later, appellant called York to say that the problem was actually the voltage regulator and the bus would not be fixed. After trying unsuccessfully to find a voltage regulator for the bus, York recommended that appellant take the bus to Lakefront for repairs. The day before the trip, appellant told York that the bus was at Lakefront and would not be ready for the trip but that Lakefront had chartered a bus to appellant that he would, in turn, charter to York for the Mackinaw trip. The two made arrangements to meet at a truck stop on the interstate in southern Michigan at 4:15 a.m. on May 15. (York was to pick up the students in Michigan at 6:00 a.m.) Appellant was to drive the bus to the agreed location and York was to drive his personal car. They were to exchange vehicles and then meet the next day at the same location and exchange back.
 {¶ 9} The two met as planned. When appellant arrived, he did not produce a charter order, a legally required paper indicating that a contract exists for the charter. Appellant told York that it had flown out the window, an occurrence not uncommon, according to Heathcock, who explained that anything left on the dashboard was likely to fly out the small side window. Appellant indicated to York that he would fax the paperwork to him at the hotel that night.
 {¶ 10} While up at Mackinaw Island, York received a call from a high school sports team requesting a bus for Cleveland the next day. He again called appellant, who indicated that the bus being fixed at Lakefront was now fixed well enough to operate. Appellant found a driver, Larry Pierson, to take the trip. When Pierson arrived to pick up the team, the athletic director did not have a check for him. Pierson contacted York, who contacted appellant. Appellant and York agreed that when the two met later that day to exchange bus for car, York would give appellant a check for the Cleveland trip. Pierson then picked up the team and drove them to Cleveland.
 {¶ 11} York was watching the school children on his charter get off the ferry from Mackinaw Island and was waiting for them to get back on the bus when he spoke on the phone with Katherine Krupp, an employee of National Trails. They were discussing charters for the next week. Krupp informed York that she had received a fax that a Lakefront bus had been stolen. Knowing that he was driving a Lakefront bus, York asked for the numbers on the bus. He was shocked to learn that he was driving the stolen bus. After trying unsuccessfully to reach appellant, he immediately called Lakefront to tell them that he was driving their stolen bus. He then tried appellant again and reached him. According to York, when he told appellant that the bus was stolen, appellant told York to "leave the bus right there and run." York did not do this. Instead, he made other arrangements for the children to get home, and he stayed with the bus. He learned from Lakefront that the FBI, suspecting terrorism, was looking for the bus. The police station was across the parking lot from where York was standing, and as he was securing the bus, police officers approached him. They ordered him to put his hands on the bus and later interviewed him for three or four hours. However, he was never arrested.
 {¶ 12} York got a ride back to the location where he was to meet appellant. York's car was there, as promised, but appellant was not. Therefore, York was unable to give appellant the check for the Cleveland trip.
 {¶ 13} The next morning, York received a phone call from the athletic director of the team Pierson had driven to Cleveland. The athletic director was demanding to know where their bus was. The driver, Larry Pierson, had told the athletic director the night before that he was going for gas and never returned. The team was stranded in Cleveland and their gear and computer equipment was on the missing bus. York made arrangements to get the team back home, and he later spoke with Pierson, the driver. Pierson explained that appellant had told him to leave the team in Cleveland because York's check bounced. Of course, York was never able to give the check to appellant.
 {¶ 14} York then testified, over objection, that appellant contacted him just days before the trial and "wanted to talk about the case." Appellant reportedly told York that "there was no charter order, nobody would believe that, you know, he * * * gave [York] a bus and [that York] took the bus, and not to show up for trial." According to York, appellant also told him that "the State of Ohio had no right to hold [York] or keep [him] and that [he] could just disregard the subpoena * * * and not show up for trial."
 {¶ 15} Larry Pierson, the driver for the Cleveland trip, also testified. He explained that he met appellant when he saw him and another unidentified man in early- to mid-May 2003, in a parking lot on the corner of Manhattan Boulevard and Franklin Avenue in Toledo. The two were standing outside a bus. The unidentified man was "lettering" the bus with the name "New Transportation" while appellant looked on. Pierson stopped and asked appellant whether he owned the bus. Appellant told Pierson that it was a church bus but that he was in charge of it. Pierson explained to appellant that he (Pierson) was a bus driver and asked whether he was hiring any drivers. Appellant reportedly told Pierson that they could always use drivers, and he took Pierson's name and number. During his testimony, Pierson identified a picture of a bus as the bus he saw on Manhattan Avenue.
 {¶ 16} A few days after Pierson met appellant, appellant called him and asked him to take a high school sports team to Cleveland. (This was Darrin York's charter.) Pierson agreed to drive for the trip and he picked up the bus at the same spot where he first met appellant: the corner of Manhattan and Franklin in Toledo. Appellant gave Pierson keys to the bus and Pierson proceeded to pick up the team in Birmingham, Michigan. While Pierson was in Cleveland with the team, appellant called him and told him to bring the bus back. When Pierson asked why, appellant said that he could not tell him right then. Pierson was bothered by the idea of returning early, and he called appellant back. This time appellant told Pierson that he needed the bus back because "the check bounced." Appellant directed Pierson to drop the team off at the hotel, make sure the team got their equipment off the bus, make some kind of excuse, and then leave. Pierson was not successful in getting the team to get all of their equipment off the bus, but he left anyway. Pierson testified that he did so against his better judgment, but his "boss" instructed him to do it, so he did. He returned the bus to Manhattan and Franklin and appellant paid him in cash.
 {¶ 17} Once Pierson arrived at home, appellant called him several times saying "if they call, don't tell them nothing." Appellant also left a message on Pierson's phone saying that he knew Pierson was probably going to go to the police, and if he (appellant) "go[es] down," Pierson was "going with [him]." Pierson took the tape out of his answering machine and gave it to the police. On re-direct examination, Pierson acknowledged that the side of the bus looked "painted over."
 {¶ 18} Detective James Couch of the Toledo Police Department, the investigator in this case, testified. He stated that police recovered the stolen Ground Transportation bus on Manhattan Boulevard and Franklin Avenue in Toledo. When the bus was recovered, it was bearing plates belonging to another vehicle and both of its vehicle identification number ("VIN") plates were missing. Shortly thereafter, he learned that another bus had been recently stolen from Lakefront in Toledo, and he began to consider whether the two thefts were somehow related. During his testimony, Couch viewed a picture of a bus and identified it as the one recovered from Manhattan and Franklin in Toledo, which he later learned was the bus stolen from Ground Transportation in Taylor, Michigan. This is the same picture that Larry Pierson viewed and identified as the bus that he took to Cleveland. During the investigation, Couch identified the bus as belonging to Ground Transportation by viewing an on-board computer; one of the readouts on this computer is the VIN number.
 {¶ 19} During the course of his investigation, Couch spoke with both Darrin York and Larry Pierson, and both indicated that they received the stolen buses from appellant. After thoroughly investigating both York and Pierson, Couch eliminated the two as suspects in the thefts of the buses. Couch called appellant and asked him to come to the police station to be interviewed. Appellant appeared for questioning; he waived his rights under Miranda v. Arizona and spoke with Couch. Initially, appellant told Couch that York had called him looking for a bus and he was going to get a bus for him from Ideal Travel, where appellant indicated he was working at the time. Later in the interview, appellant told Couch that York and Pierson committed the criminal acts and were setting him up. Finally, appellant told Couch that:
 {¶ 20} "himself and Mr. York had met in Toledo at Byrne and Hill, which is a quarter of a mile from the Hill Avenue Lakefront facility, had driven there in Mr. York's car and Mr. York had entered the facility, taken a bus, drove to mile marker 15, which Mr. Jones followed.
 {¶ 21} "Upon arriving at mile marker 15 he was given one thousand dollars cash for getting the bus to Mr. York, and he split that money with the bus cleaner which was inside Lakefront and had helped him set this deal up, so he claimed that he made five hundred dollars on the deal and that the bus cleaner had made five hundred dollars on the deal.
 {¶ 22} "He then added that he had the same setup in Michigan for the Ground Transportation bus, that he had a guy inside that helped him get this bus."
 {¶ 23} Gregory Schmitt, the owner of Ground Transportation, also testified and identified the bus pictured in Exhibits 2 and 3 as his bus. This is the same bus that Couch identified as the stolen Ground Transportation bus and the same bus that Pierson had identified as the one he drove to Cleveland.
 {¶ 24} Appellant presented two defense witnesses: an employer who testified that appellant worked long hours for her and would not have had time to run a bus company, and a girlfriend who testified that appellant was with her in the early morning hours of May 15.
 {¶ 25} Following deliberations, the jury found appellant guilty of receiving stolen property and grand theft and not guilty of tampering with vehicle identification numbers. The trial court sentenced appellant to concurrent 17-month sentences. He now appeals, setting forth the following assignments of error:
 {¶ 26} "I. The trial court erred by ordering consecutive sentences.
 {¶ 27} "II. Consecutive sentences were ordered to punish defendant.
 {¶ 28} "III. Prosecutorial misconduct occurred thereby denying defendant a fair trial.
 {¶ 29} "IV. The conviction was not supported by sufficient evidence."
 {¶ 30} We shall address the sufficiency argument first.
 {¶ 31} "Sufficiency of the evidence" is a legal standard that the court applies to determine if a case should go to a jury or to determine whether there is sufficient evidence to support a verdict. State v.Thompkins (1997), 78 Ohio St.3d 380, 386, quoting Black's Law Dictionary (6 Ed. 1990) 1433. According to the Supreme Court of Ohio, "sufficiency is a test of adequacy." Thompkins, 78 Ohio St.3d at 386. In this case, appellant contends that there was not sufficient evidence to allow a jury to find beyond a reasonable doubt that he committed the offenses. He points out that no "physical evidence" exists connecting appellant to the thefts.
 {¶ 32} The elements of grand theft are set out in R.C. 2913.02, which provides:
 {¶ 33} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 {¶ 34} "(1) Without the consent of the owner or person authorized to give consent;
 {¶ 35} "(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
 {¶ 36} "(3) By deception;
 {¶ 37} "(4) By threat;
 {¶ 38} "(5) By intimidation.
 {¶ 39} "(B)(1) Whoever violates this section is guilty of theft.
 {¶ 40} "* * *.
 {¶ 41} "(5) If the property stolen is a motor vehicle, a violation of this section is grand theft of a motor vehicle, a felony of the fourth degree."
 {¶ 42} Therefore, as relevant to this case, the prosecution needed to prove that appellant, with a purpose to deprive Lakefront of its bus, knowingly obtained it or exerted control over it without consent.
 {¶ 43}
The elements of receiving stolen property are set out in R.C. 2913.51, which provides:
 {¶ 44} "(A) No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense.
 {¶ 45} "* * *.
 {¶ 46} "(C) Whoever violates this section is guilty of receiving stolen property. * * *. If the property involved is a motor vehicle, as defined in section 4501.01 of the Revised Code * * * receiving stolen property is a felony of the fourth degree."
 {¶ 47} Therefore, as relevant to this case, the prosecutor needed to prove that appellant received or retained the Ground Transportation bus knowing it was stolen or having reasonable cause to believe that it was stolen.
 {¶ 48} With regard to the grand theft charge, there was evidence that appellant once worked for Lakefront, he never returned a master key, the bus was stolen, and appellant was in control of it. There was also evidence that, when York confronted appellant with the news that the bus was stolen, appellant advised York to leave the bus and run. Similarly, there is evidence that appellant tried to dissuade York from testifying at trial. In addition, there was evidence that appellant admitted taking part in the theft, even though he did not admit being the principal. We find that the evidence for the grand theft charge was more than sufficient.
 {¶ 49} Similarly, with regard to the receiving stolen property charge, there was evidence that appellant was in control of a bus that was missing its VIN number plates, that he stood by and watched while another individual "re-lettered" the bus, that he called the bus back from Cleveland when the stolen Lakefront bus was discovered, and that he advised Pierson not to say anything to the police and warned Pierson that if he was "going down," Pierson was "going down" with him. All of this evidence tends to show that appellant either knew the bus was stolen or should have known so. Again, the evidence is more than sufficient for the receiving stolen property charge. Appellant's fourth assignment of error is found not well-taken.
 {¶ 50} Appellant challenges his consecutive sentences in his first and second assignments of error.
 {¶ 51} An appellate court's choices upon review of a sentence are set out in R.C. 2953.08(G)(2). That section provides:
 {¶ 52} "The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
 {¶ 53} "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard of review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
 {¶ 54} "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (E)(4) of section 2929.14, or division (H) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
 {¶ 55} "(b) That the sentence is otherwise contrary to law."
 {¶ 56} R.C. 2929.14(E)(4), which governs consecutive sentencing, provides:
 {¶ 57} "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 {¶ 58} "(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 {¶ 59} "(b) At least two of the multiple offense were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses, so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
 {¶ 60} "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
 {¶ 61} In addition, R.C. 2929.19(B)(2), which governs sentencing hearings, provides:
 {¶ 62} "The court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances:
 {¶ 63} "* * *.
 {¶ 64} "(c) If it imposes consecutive sentences under section 2929.14
of the Revised Code, its reasons for imposing the consecutive sentences."
 {¶ 65} The Ohio Supreme Court has interpreted these sections to mean that a court ordering consecutive sentences must, at the sentencing hearing, make the findings required by R.C. 2929.14 and give its reasons for the findings. State v. Comer, 99 Ohio St.3d 463, 2003-Ohio-4165, at ¶ 20. The court in Comer explained,
 {¶ 66} "While consecutive sentences are permissible under the law, a trial court must clearly align each rationale with the specific finding to support its decision to impose consecutive sentences. These findings and reasons must be articulated by the trial court so an appellate court can conduct a meaningful review of the sentencing decision." Id. at ¶ 21.
 {¶ 67} The trial court made the following statements on the record to justify the consecutive sentences:
 {¶ 68} "The Court has considered whether to run these 2 sentences concurrently or consecutively finding that consecutive sentences are in order for these two counts and consecutive sentences are in order for this case as opposed to the case in Cuyahoga County because, number one, it's necessary to protect the public from future crime because of the history of the offenses, the nature of the offenses. It's necessary to punish the offender, and nothing has stopped you so far.
 {¶ 69} "Also the Court finds it's not disproportionate to the seriousness of the offender's conduct because of the repetitive pattern that we have here and the value of the property involved, and also the risk you put passengers through with this whole thing, stranding them almost twice, places they don't want to be.
 {¶ 70} "The Court also finds that consecutive sentences are not disproportionate to the danger that you pose to the public because you will go right back to doing the same thing, and the Court finds that you have a prior history of criminal conduct."
 {¶ 71} We find that the trial court made the proper findings and gave its reasons for those findings. First, as required by R.C. 2929.14(E)(4), the trial court made a finding that consecutive sentences were necessary to "protect the public from future crime," due to the nature of the offenses and the fact that appellant had a history of these offenses. The trial court also found, pursuant to R.C. 2929.14(E)(4), that consecutive sentences were necessary to "punish the offender" because "nothing has stopped [him] before."[1] The court also found, as required by R.C.2929.14(E)(4) that consecutive sentences were not "disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public" because appellant was engaged in a pattern of this type of conduct, because of the value of the buses stolen, because passengers were stranded in a distant city as a result of appellant's actions, because appellant was likely to go back to committing the same type of offense, and because appellant has a history of criminal conduct.
 {¶ 72} In addition to these findings, the trial court was required to make one of the findings in R.C. 2929.14(E)(4)(a) — (c). Here, the trial court made a finding under R.C. 2929.14(E)(4)(c) that appellant had a history of criminal conduct and that it was necessary to protect the public because of it. Therefore, the court made the appropriate findings and gave its reasons for its findings, and appellant's first assignment of error is not well-taken.
 {¶ 73} In his second assignment of error, appellant contends that the trial court, in ordering consecutive sentences, either directly or indirectly punished him for exercising his right to trial. At the sentencing hearing, when the court was weighing the R.C. 2929.12
factors, the court stated:
 {¶ 74} "The record should reflect that the court is specifically looking at and referring to State versus Comer, recent Supreme Court decision, Ohio Supreme Court decision. The Court has considered the sentencing statute 2929.12 and finds that recidivism is more likely because this offense was committed while the defendant was under community control, has a history of criminal convictions, has not responded to sanctions in the past.
 {¶ 75} "Obviously no genuine remorse because we spent the last 3 days in trial."
 {¶ 76} Clearly, a trial court may not assume that one does not have remorse simply because one exercises his constitutional right to a jury trial. See State v. Gaston, 8th Dist. No. 82628, 2003-Ohio-5825, at ¶ 18 ("[r]emorse is a statutory factor to consider when sentencing an offender, but a defendant's decision to go to trial is not a measure of remorse"). Though we find that the trial court erred in finding that appellant's decision to go to trial indicated a lack of remorse, we find that the record amply supports the trial court's decision to impose consecutive sentences, as discussed above. Accordingly, appellant's second assignment of error is found not well-taken.
 {¶ 77} In his third assignment of error, appellant contends that some of the prosecutor's remarks in closing argument constituted prosecutorial misconduct. Specifically, appellant challenges the following remarks:
 {¶ 78} "Do you really think this is the first time this man has done this type of thing before? I mean, think about it. Isn't it ironic that both companies that he was employed at as a bus driver both had buses stolen. Both of these buses had the keys in it. It isn't like the column is peeled.
 {¶ 79} "You heard testimony from the officer manager at Lakefront that they never got their keys back from him when he left their employment. This has happened before, but what you're concerned with today is just the 4 counts that are contained in the indictment.
 {¶ 80} "* * *. What he has done, he has commandeered half a million dollar buses from previous employers * * *."
 {¶ 81} Defense counsel did not object to these remarks.
 {¶ 82} The Supreme Court of Ohio has held that "[t]he test for prosecutorial misconduct is whether remarks are improper and, if so, whether they prejudicially affected substantial rights of the accused."State v. Lott (1990), 51 Ohio St.3d 160, 165, certiorari denied (1990),498 U.S. 1017. However, where, as here, there was no objection to the alleged improper statements, any error is deemed waived. See State v.Wogenstahl (1996), 75 Ohio St.3d 344, 360. Under similar circumstances, we previously held:
 {¶ 83} "Our review [of the alleged improper statements], therefore, is discretionary and limited to plain error only. While Crim.R. 52(B) provides that `* * * plain errors or defects affecting substantial rights may be noticed although they are not brought to the attention of the trial court[,]' notice of plain error must be taken with the utmost caution, under exceptional circumstances, and only in order to prevent a manifest miscarriage of justice. In order to prevail on a claim governed by the plain error standard, appellant must demonstrate that the outcome of his trial would clearly have been different but for the errors he alleges. Thus, the alleged prosecutorial misconduct constitutes plain error only if it is clear that appellant would not have been convicted in the absence of the improper comments. In cases such as this, the plain error standard generally presents `an almost insurmountable obstacle to reversal.'" (Citations omitted.) State v. Griffin (Nov. 17, 2000), 6th Dist. No. L-98-1215, discretionary appeal not allowed (2001),91 Ohio St.3d 1474.
 {¶ 84} We need not decide whether the prosecutor's remarks were improper; even if we assume they were, they clearly do not warrant reversal based on the plain error standard of review. Given the ample evidence of guilt presented to the jury, we cannot say that appellant would not have been convicted if not for the alleged improper comments. Appellant's third assignment of error is found not well-taken.
 {¶ 85} Upon due consideration, we find that appellant was not prejudiced or prevented from having a fair trial, and the judgment of the Lucas County Court of Common Pleas is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Singer, P.J. Concur.
[1] The court was referring to the fact that appellant was on community control for a similar offense in Cleveland. Although the court did not order a presentence report that would have verified this fact, appellant does not dispute it.